**Arlette MILLER, Individually and on Behalf of All Others Similarly Situated, Plaintiffs,**

v.

**LAZARD, LTD., Bruce Wasserstein, Steven J. Golub, William M. Lewis, Michael J. Castellano and Goldman Sachs & Co., et al., Defendants.**

**No. 05 Civ. 5630(VM).**

United States District Court,
S.D. New York.

Feb. 7, 2007.

---

David Avi Rosenfeld, Lerach, Coughlin, Stoia, Geller, Rudman & Robbins, LLP(LIS), Melville, NY, Evan J. Smith, Brodsky & Smith, L.L.C., Mineola, NY, Samuel Kenneth Rosen, Wechsler Harwood LLP, Jeffrey Charles Zwerling, Zwerling, Schachter & Zwerling, New York, NY, for Plaintiffs.

Marc Wolinsky, Adir Gurion Waldman, Wachtell, Lipton, Rosen & Katz, Francis P. Barron, Cravath, Swaine & Moore LLP, New York, NY, Sarah Fern Meil, Attorney at Law, Stockton, NJ, for Defendants.

## DECISION AND ORDER

MARRERO, District Court.

### I. *INTRODUCTION*

Lead plaintiffs, Diana B. Lien, Charles F. Lin, and Edward Schonberg, brought this class action along with plaintiffs Lawrence O. Viands and Nanette Katz (collectively, "Plaintiffs") alleging violations of §§ 11, 12(a)(2), and 15 the Securities Act of 1933, (the "Securities Act" or the "1933 Act"), 15 U.S.C. §§ 77 et seq.; § 10(b) of the Securities Exchange Act of 1934 (" § 10(b)"), 15 U.S.C. § 78a et seq. (the "Exchange Act") and Securities and Exchange Commission ("SEC") Rule 10b–5

promulgated thereunder, 17 C.F.R. § 240.10b–5. The complaint names as defendants Lazard Ltd. ("Lazard" or the "Company"), Lazard Freres & Co. ("Lazard Freres") LLC, Bruce Wasserstein ("Wasserstein"), Steven J. Golub ("Golub"), Michael J. Castellano ("Castellano"), and Scott D. Hoffman ("Hoffman") (collectively, the "Lazard Defendants"); and Goldman Sachs & Co. ("Goldman Sachs"); Citigroup Global Markets Inc. ("Citigroup"); Merrill Lynch, Pierce, Fenner & Smith, Inc. ("Merrill Lynch"); Morgan Stanley & Co., Inc. ("Morgan Stanley"); Credit Suisse First Boston LLC ("Credit Suisse"); and J.P. Morgan Securities Inc. ("J.P.Morgan") (collectively, the "Underwriter Defendants"). All defendants moved to dismiss the complaint under Federal Rules of Civil Procedure 12(b)(6) ("Rule 12(b)(6)") and Rule 9(b) ("Rule 9(b)"). The motions assert that the complaint fails to state a claim upon which relief may be granted and to plead fraud with sufficient particularity.

For the reasons stated therein, the Court grants both the Lazard Defendants' motion to dismiss and the Underwriter Defendants' motion to dismiss in their entirety.

## II. BACKGROUND

In ruling on defendants' motion to dismiss pursuant to Rule 12(b)(6), the Court accepts the following facts, which are derived from the allegations contained in the Plaintiffs' Consolidated Amended Complaint, dated October 31, 2005 (the "Complaint") and the documents cited or relied upon for the facts pled therein. *See Chambers v. Time Warner, Inc.*, 282 F.3d 147, 152 (2d Cir.2002).

### A. THE PARTIES

#### 1. Plaintiffs

Plaintiffs assert that they bring this action "on behalf of purchasers of the common stock of Lazard who purchased such shares pursuant and/or traceable to the Company's. Registration Statement and Prospectus ... declared effective on May 4, 2005, as amended ..., issued in connection with the initial public offering of the Lazard common stock (the "IPO"), together with those who purchased shares of Lazard common stock in the open market between May 4, 2005 and May 12, 2005, inclusive (the "Class Period")." (Compl.¶ 1.) (*See also* Registration Statement (the "Registration Statement") and Prospectus, dated May 5, 2005 (the "Prospectus"), attached as Ex. 1 of Affidavit of Marc Wolinksky in Support of Motion to Dismiss the Complaint, dated April 24, 2006 ("Wolinsky Aff.")).

#### 2. Defendants

Lazard is a financial advisor and asset management firm incorporated under the laws of Bermuda and principally located in New York, New York. The Complaint alleges that, at all relevant times, the following defendants, identified collectively as the "Individual Defendants," held the offices indicated below at Lazard and signed the Registration Statement:

Wasserstein: Chairman of the Board of Directors, Chief Executive Officer, and Chairman of the Executive Committee of Lazard since 2002;

Golub: Vice Chairman, Managing Director, and Chairman of the Financial Advisory Group of the Company;

Castellano: Chief Financial Officer, Principal Accounting Officer, Vice President, and Managing Director;

Hoffman: General Counsel of Lazard since May 2005.

The Complaint alleges that each of the Individual Defendants "had access to ... adverse undisclosed information about [Lazard's] business ... via access to internal

corporate documents, ... conversations, and connections with other corporate officers and employees, attendance at management and Board of Directors meetings and committees thereof and via reports and other information." (Compl.¶ 33.)

Before the Class Period, Lazard was a single, privately-held firm. Prior to the IPO, descendants of the founding brothers owned approximately one-third of the Company. Lazard went public by way of private securities offerings (the "Offerings"), including the private offering of Equity Securities Units, a private offering of Lazard Group 7.125 percent Senior Notes, a private placement of securities with IXIS Corporate & Investment Bank, and the IPO.

Goldman Sachs is an investment banking and securities firm, incorporated in Delaware and principally located in New York, New York. Goldman Sachs acted as lead underwriter, sole book-running manager, and representatives of the underwriters for Lazard's IPO.

Citigroup, Lazard Freres, Merrill Lynch, Morgan Stanley, Credit Suisse, and J.P. Morgan, each of which provides various financial services, all acted as underwriters for Lazard's IPO.

## B. FACTUAL ALLEGATIONS

Lazard, after substantial expansion since its founding in 1848 and following the merger of its independent "houses" of Lazard in January 2000, eventually focused exclusively on financial services; the independent "houses" became one firm, Lazard LLC. Michel David–Weill ("David–Weill"), a descendant of the founding families, having joined the firm in 1956, became a senior partner in 1977. By 2005, David–Weill was the sole remaining member of the original family who was also a member of the firm.

Wasserstein joined the top management of Lazard in early 2002. The firm restructured its ownership during the second half of 2004. By December of that year, Lazard LLC announced that it would buy out the interests of David–Weill and other descendants of the founding families. The Complaint alleges that the only way the buyout could be completed was by way of an initial public offering.

### 1. Financial Details of the IPO

Plaintiffs allege that Lazard's Offerings had to raise more than $1.8 billion in order to complete Lazard's reorganization and to buy out David–Weill and other historical partners of the firm. This amount comprised the following: $67 million and $83 million to recapitalize certain Lazard holdings; $56.7 million to repay certain notes; and $1.6 billion for David–Weill and the firm's historical partners. (See id. ¶ 52.)

Lazard's private securities offerings were expected to raise net proceeds of approximately $1.026 billion. This amount translated to a $775 million gap to be filled by the IPO. At $25 per share, Lazard expected gross proceeds of roughly $855 million. Lazard would net approximately $788 million from that sum and achieve the $1.8 billion target. (See id. ¶¶ 53–54.)

Goldman Sachs, as the lead underwriter, was responsible for negotiating an initial offering price for the securities with the issuer. After purchasing shares at a discounted rate from the issuer, the lead underwriter resells those shares at the public offering price; the underwriter's compensation is the difference between the amount the underwriter pays the issuer and the price at which the shares are publicly sold. In a firm commitment underwriting, the lead underwriter owns the securities and is obligated to pay the issuer regardless of whether it can actually resell those shares at the public offering price. The underwriters' discount in this case was $1.25 per share. Thus, Goldman

Sachs committed to pay Lazard $23.75 per share regardless of the actual resale price of the shares during the offering. *(See id.* ¶¶ 55–56.)

### 2. *Road Show for Institutional Investors*

Generally, after an underwriter develops indications of interest prior to an initial public offering, the issuer's management begins a "road show" to market the shares by talking with large, often institutional, investors. The goal of such efforts is to convince investors to buy a significant stake in the company on the basis of the details and figures presented. A draft version of a prospectus is issued to assess interest level of the investors.

Plaintiffs allege that the recipients of the preliminary prospectuses indicated that they were willing to purchase an interest in Lazard at a price of approximately $21 or $22 per share, less than initial offering price of $25 per share eventually agreed upon by Wasserstein, Lazard, and Goldman Sachs. Although the stock traded up slightly at $25.10 on May 5, 2005, it fell to a low of $21.61 on May 12, 2005. *(See id.* ¶¶ 57–59, 71.)

### C. *SCIENTER ALLEGATIONS*

The Complaint accuses both sets of defendants of false and misleading statements in connection with the Lazard IPO, as well as participation in a scheme to defraud. Plaintiffs contend that specific sections within the Prospectus misled potential investors because Defendants did not mention that indications of interest that Lazard obtained during the "road show" were lower than the $25 per share offering price. Plaintiffs also assert that the Prospectus does not mention that the share price determination was based on the price of the buyout, rather than the price the market would bear. Moreover, the Complaint asserts that Lazard knew that Goldman Sachs would be required to engage in "manipulative trading" in order to artificially prop up the price of Lazard's common stock. *(See id.* ¶¶ 78–80.)

Plaintiffs further claim that the Prospectus does not disclose that Goldman Sachs attempted to "create a market" and manufacture an appearance of accurate pricing for Lazard by entering into side agreements with hedge funds. Plaintiffs outline the purported Goldman Sachs' scheme as follows: (a) deceiving the investing public regarding demand for shares of Lazard stock in the IPO; (b) manipulating Lazard's share price to create a false sense of demand; and (c) submitting required SEC filings more than two weeks late in an effort to cover up the scheme. Finally, the Complaint asserts that this scheme caused Plaintiffs and other class members to purchase Lazard common stock at an artificially high price and to suffer damages after Goldman Sachs stopped repurchasing stock from the hedge funds, pursuant to "side agreements." *(Id.* ¶¶ 81, 87.)

### D. *PROCEDURAL HISTORY*

Plaintiffs commenced the first suit affiliated with this action on June 16, 2005. By Order dated August 9, 2005, the Court consolidated six separate actions against Lazard Ltd. By Order dated September 15, 2005, the Court appointed certain individuals as lead plaintiffs and approved the selection of Lerach Coughlin Stoia Geller Rudman & Robbins LLP as lead counsel. Plaintiffs filed an amended and consolidated complaint on October 31, 2005. These motions followed.

### III. *LEGAL STANDARD*

### A. *STANDARD OF REVIEW*

In assessing a motion to dismiss under Rule 12(b)(6), the court may grant such a remedy only where "it appears beyond doubt that the plaintiff can prove no set of

facts in support of his claim which would entitle him to relief." *Twombly v. Bell Atlantic Corp.*, 425 F.3d 99, 106 (2d Cir. 2005) *(quoting Conley v. Gibson*, 355 U.S. 41, 45–46, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957)). The task of the court in ruling on a motion to dismiss is to "assess the legal feasibility of the complaint, not to assay the weight of the evidence which might be offered in support thereof." *In re Initial Pub. Offering Sec. Litig.*, 383 F.Supp.2d 566, 574 (S.D.N.Y.2005) *("IPO")*. The court must accept all well-pleaded factual allegations in the complaint as true, and draw all reasonable inferences in the plaintiff's favor. *See Chambers*, 282 F.3d 147, 152 (2d Cir.2002).

Courts may consider any documents that are attached to, referenced in, or integral to the preparation of the pleadings. *See id.* at 152–53. Although the court generally does not consider matters outside the pleadings, the court "may take judicial notice of well-publicized stock prices without converting the motion to dismiss into a motion for summary judgment." *Ganino v. Citizens Utilities Co.*, 228 F.3d 154, 167 n. 8 (2d Cir.2000) (citing cases). In this case, the Court may take such judicial notice of Lazard's historical stock prices on the New York Stock Exchange. *(See* Chart of Historical Stock Prices of Lazard Ltd, attached as Ex. 4 of the Wolinsky Aff.)

Plaintiffs state that their investigation into the Lazard public offering at issue, on which the facts stated in the Complaint are based, included: (a) review and analysis of filings made by Lazard; (b) review and analysis of press releases, public statements, news articles, securities' analysts reports, and other publications disseminated by or concerning Lazard; (c) interviews with former Lazard employees; and (d) other publicly available information about Lazard. *(See* Compl. ¶ 1).

## B. *SECURITIES ACT OF 1933*

### 1. *Sections 11 and 12(a)(2)*

Section 11 of the 1933 Act ("§ 11") details the parties that purchasers of registered securities may hold liable if a registration statement contains an untrue statement of a material fact or omits to state a material fact necessary to make the statements therein not misleading. This list includes any signer of a registration statement and any director of the issuer. *See* 15 U.S.C. § 77k(a). Section 12(a)(2) ("§ 12(a)(2)") imposes liability for selling or offering a security by means of a prospectus that includes an untrue statement of material fact or omits a material fact necessary to make such statements not misleading. *See id.* § 77l(a)(2). Thus, to state a cognizable claim under either §§ 11 or 12(a)(2) of the 1933 Act, Plaintiffs must show that Registration Statement and/or the Prospectus for Lazard's May 2005 IPO contained an untrue statement of material fact or omitted to state a material fact that was required to be stated therein or was necessary to make the statements therein not misleading.

In analyzing the Plaintiffs' §§ 11 and 12 claims, the Court is guided by several applicable principles, including materiality, whether statements are misleading when the Prospectus is considered in its entirety, and the "bespeaks caution" doctrine.

#### a. *Materiality*

Under §§ 11 and 12(a)(2), a misrepresentation of material fact in a securities registration statement or prospectus occurs when an investor would attach importance to it in making an investment decision. *See Basic Inc. v. Levinson*, 485 U.S. 224, 231, 108 S.Ct. 978, 99 L.Ed.2d 194 (1988); *see also Steinberg v. PRT Group*, 88 F.Supp.2d 294, 300 (S.D.N.Y. 2000); *In re APAC Teleservices, Inc. Sec. Litig.*, 1999 WL 1052004, at *9 (S.D.N.Y.

Nov.19, 1999). Similarly, an omission is material if there is a substantial likelihood that the "disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the 'total mix' of the information made available." *TSC Indus., Inc. v. Northway, Inc.,* 426 U.S. 438, 449, 96 S.Ct. 2126, 48 L.Ed.2d 757 (1976).

■ A court may dismiss a claim on the ground that a misstatement or an omission in a registration statement or prospectus was not material, but the task presents a difficult challenge. Materiality is generally a question for the fact finder. *See Kronfeld v. Trans World Airlines, Inc.,* 832 F.2d 726, 734-36 (2d Cir.1987). Thus, "a complaint may not properly be dismissed pursuant to 12(b)(6) ... on the ground that the alleged misstatement or omissions are not material unless they are so obviously unimportant to a reasonable investor that reasonable minds could not differ on the question of their importance." *Milman v. Box Hill Sys. Corp.,* 72 F.Supp.2d 220, 228 (S.D.N.Y.1999) *(quoting Goldman v. Belden,* 754 F.2d 1059, 1067 (2d Cir.1985)).

b. *Comprehensive Consideration of Prospectus*

■ In assessing whether statements provided in the prospectus are materially misleading, the prospectus must be read as a whole, not selectively or in a piecemeal fashion. *See Olkey v. Hyperion 1999 Term Trust, Inc.,* 98 F.3d 2, 5 (2d Cir. 1996). If a plaintiff's claims of misstatement or omission contradict the plain language of the prospectus, the court bears no obligation to accept as true the allegations of the complaint. *See Barnum v. Millbrook Care Ltd. P'ship,* 850 F.Supp. 1227, 1232-33 (S.D.N.Y.1994) (citing cases), *aff'd,* 43 F.3d 1458 (2d Cir.1994). If such a clear conflict between the language of the prospectus and the alleged misstate-

ments or omissions exists, dismissal is appropriate because no set of facts could prove the plaintiff's claims. *See Olkey,* 98 F.3d at 9. The Second Circuit has consistently upheld Rule 12(b)(6) dismissals of securities claims where the risks that a plaintiff's claim went unaddressed were mentioned explicitly in the prospectus. *See id.; see also I. Meyer Pincus & Assoc., P.C. v. Oppenheimer & Co., Inc.,* 936 F.2d 759, 762 (2d Cir.1991).

c. *Bespeaks Caution Doctrine*

■ Under the "bespeaks caution" doctrine, certain alleged misrepresentations in a stock offering are "immaterial as a matter of law because [a] reasonable investor would not have considered them important because of adequate cautionary language in the relevant offering." *See Halperin v. eBanker USA.com, Inc.,* 295 F.3d 352, 357 (2d Cir.2002); *see also P. Stolz Family P'ship L.P. v. Daum,* 355 F.3d 92, 96 (2d Cir.2004) (explaining this doctrine with respect to individuals accused of omissions and misrepresentations under § 12(a)(2)). Vague disclosures of general risks will not protect defendants from liability. Instead, the relevant cautionary language must be "prominent and specific," and must directly address "the risk that plaintiffs claim was not disclosed." *Olkey,* 98 F.3d at 5. Since most, if not all, securities offerings contain cautionary words, a district court must pay close attention to the question of whether the language provided matches the risk addressed. *See Halperin,* 295 F.3d at 359.

C. *SECTION 10(b) AND RULE 10b-5 PLEADING STANDARDS*

To adequately state a cause of action for securities fraud under § 10(b) of the Exchange Act and Rule 10b-5, a plaintiff must assert facts showing that "the defendant made a false statement or omitted a

material fact, with scienter, and that plaintiff's reliance on defendant's action caused plaintiff injury." *Kalnit v. Eichler*, 264 F.3d 131, 138 (2d Cir.2001) *(quoting San Leandro Emergency Med. Group Profit Sharing Plan v. Philip Morris Cos.*, 75 F.3d 801, 808 (2d Cir.1996)). In an action under § 10(b) and Rule 10b–5, plaintiffs must allege a state of mind evidencing " 'an intent to deceive, manipulate or defraud.' " *Ganino*, 228 F.3d at 168 *(quoting Ernst & Ernst v. Hochfelder*, 425 U.S. 185, 193 n. 12, 96 S.Ct. 1375, 47 L.Ed.2d 668 (1976)).

Securities fraud actions are subject to the heightened pleading requirements of the Private Securities Litigation Reform Act of 1995 ("PSLRA"), Pub.L. No. 104–67, 109 Stat. 737, as well as those of Rule 9(b). *See Kalnit*, 264 F.3d at 138; *see also Novak v. Kasaks*, 216 F.3d 300, 306 (2d Cir.2000). Moreover, the heightened pleading standard of Rule 9(b) applies with equal force to §§ 11 and 12(a)(2) allegations that are premised on allegations of fraud. *See Rombach*, 355 F.3d at 171. To satisfy the pleading standard of Rule 9(b), such allegations of fraud must be pled with particularity. Specifically, the complaint must: (1) specify the statements that the plaintiff alleges were fraudulent, (2) identify the speaker, (3) indicate when and where the statements were made, and (4) explain why the statements were fraudulent. *See Cosmas v. Hassett*, 886 F.2d 8, 11 (2d Cir.1989); *Mills v. Polar Molecular Corp.*, 12 F.3d 1170, 1175 (2d Cir.1993).

The PSLRA imposes similar heightened pleading standards when a plaintiff alleges a material misrepresentation or omission.[1] *See Rombach*, 355 F.3d at 174.

### 1. *False or Misleading Statement or Omission*

■ In pleading a securities fraud claim based on misrepresentations, a plaintiff must first allege that the defendant either made a false or misleading statement or omitted material information. *See Acito v. IMCERA Group*, 47 F.3d 47, 52 (2d Cir. 1995). Such allegations will not support a claim of securities fraud unless the defendant has a duty to disclose the information. The Second Circuit has held that "one circumstance creating a duty to disclose arises when disclosure is necessary to make prior statements not misleading." *In re Time Warner, Inc. Sec. Litig.*, 9 F.3d 259, 268 (2d Cir.1993).

### 2. *Scienter*

■ Pursuant to the PSLRA, a plaintiff can allege sufficient facts to support a "strong inference" of state of mind by "alleging facts to show that defendants had both motive and opportunity to commit fraud" or by "alleging facts that constitute strong circumstantial evidence of conscious misbehavior or recklessness." *Kalnit*, 264 F.3d at 138–39. (quotation marks and internal citations omitted). In the Second Circuit, the interpretation of the PSLRA has resulted in a blended approach to assessing the sufficiency of pleadings with

---

1. In fact, PSLRA standard is nearly identical to that of Rule 9(b), requiring specifically that:

   In any private action arising under [this section of the Exchange Act] in which the plaintiff alleges that the defendant—
   1. (A) made an untrue statement of a material fact; or
   (B) omitted to state a material fact necessary in order to make the statements made, in the light of the circumstances in which they were made, not misleading;
   the complaint shall specify each statement alleged to have been misleading, the reason or reasons why the statement is misleading, and, if an allegation regarding the statement or omission is made on information and belief, the complaint shall state with particularity all facts on which that belief is formed.

   15 U.S.C. § 78u–4 (b)(1).

respect to scienter. First, pleadings must be evaluated for facts demonstrating either (i) motive and opportunity, or (ii) conscious misbehavior or recklessness. *See In re Alstom SA Sec. Litig.*, 406 F.Supp.2d 433, 446 (S.D.N.Y.2005). Second, analysis of such pleadings should incorporate this Circuit's case law prior to and after the passage of the PSLRA. *Id.*

### a. *Motive and Opportunity*

Sufficient motive allegations detail specific benefits that could be realized by defendants by reason of one or more of the false statements or misleading omissions claimed. *See Novak*, 216 F.3d at 307. Plaintiffs must assert concrete and individual gain to each defendant resulting from the fraud. *Id.* at 307–08. General motives that can be applied to "virtually all corporate insiders," or "any publicly owned, for profit endeavor" are not sufficient to support a claim of fraud. *Kalnit*, 264 F.3d at 138–139.

### b. *Conscious Misbehavior or Recklessness*

If plaintiffs fail to allege scienter through motive and opportunity, a securities fraud claim may still be sufficiently stated if the allegations show "strong circumstantial evidence of conscious misbehavior or recklessness." *Acito*, 47 F.3d at 52. Under the conscious misbehavior dismissal theory, plaintiffs must allege reckless conduct which is, at a minimum, "highly unreasonable" and "represents an extreme departure from the standards of ordinary care to the extent that the danger was either known to the defendant or so obvious that the defendant must have been aware of it." *In re Carter–Wallace, Inc. Sec. Litig.*, 220 F.3d 36, 39 (2d Cir. 2000).

In actions brought under Rule 10b–5, the contours of recklessness are not definite. *See Novak*, 216 F.3d at 308 ("Recklessness is harder to identify with preci-

sion and consistency."). Second Circuit case law that predates PSLRA highlights factual allegations indicating that defendants (1) possessed knowledge of facts or access to information contradicting their public statements or (2) "failed to review or check information that they had a duty to monitor, or ignored obvious signs of fraud." *Alstom*, 406 F.Supp.2d at 447 (quoting *Novak*, 216 F.3d at 308).

### 3. *Causation*

Lastly, to adequately state a claim for securities fraud, a plaintiff must plead both transaction and loss causation. *See First Nationwide Bank v. Gelt Funding Corp.*, 27 F.3d 763, 769 (2d Cir.1994) (citing cases). Transaction causation is similar to reliance and requires a showing indicating that "but for the claimed misrepresentations or omissions, the plaintiff would not have entered into the detrimental securities transaction." *Lentell v. Merrill Lynch & Co.*, 396 F.3d 161, 172 (2d Cir.2005). Loss causation requires a link between the alleged misconduct and the ultimate economic harm suffered by the plaintiff; it is pled through facts alleging that the plaintiff's loss was, at least partially, caused by the defendant's conduct. *See Emergent Capital Inv. Mgmt. v. Stonepath Group, LLC*, 343 F.3d 189, 197 (2d Cir.2003). The Second Circuit has recently expounded upon the loss causation element of securities fraud, indicating that a plaintiff must claim that "the loss be foreseeable and that the loss be caused by the materialization of the concealed risk." *Lentell*, 396 F.3d at 173.

## IV. *DISCUSSION*

### A. *THE ALLEGED MISREPRESENTATIONS*

Plaintiffs allege two types of misconduct by the Lazard Defendants, each relating to the accuracy of the Prospectus. First,

Plaintiffs identify specific statements from the Prospectus and characterize those statements as materially false and misleading. Second, Plaintiffs allude to a scheme to manipulate the market both prior to and after the Lazard IPO. The Court addresses these alleged material misrepresentations and omissions in turn.

### 1. Absence of Price Factors

■ The initial excerpt from the Prospectus highlighted by Plaintiffs as false and misleading states the following:

> Prior to this offering, there has been no public market for the shares of our common stock. The initial public offering price has been negotiated between us and the representative. *Among the factors considered in determining the initial public offering price of the shares, in addition to prevailing market conditions, were our historical performance, estimates of our business potential and earnings prospects, an assessment of our and LAZ–MD Holdings' management and the consideration of the above factors in relation to market valuation of companies in related businesses.*

(*Prospectus*, Wolinsky Aff. Ex. 1 at 204.) (Emphasis added.) Plaintiffs allege that the excerpt quoted above is materially false and misleading because Defendants do not disclose that Lazard's IPO price was dictated by Wasserstein's need to bridge the funding gap required for him to buy out the interests of David–Weill and the historical partners. Plaintiffs also assert that the statement disregarded purchase prices offered during prevailing indications of interest that Lazard solicited during the "road show." In short, Plaintiffs claim that the statements reflect neither the Defendants' true beliefs about the value of the Lazard shares at the time of the IPO, nor the full array of factors that helped determine that price. The Court disagrees.

### a. Buyout of David–Weill and Historical Partners

In evaluating a claim of material misstatement or omission, the Court assesses the Prospectus in its entirety. *See Olkey*, 98 F.3d at 5. Thus, while the section of the Prospectus identified by Plaintiffs and mentioned above does not make explicit reference to the buyout of David–Weill and the historical partners, the Prospectus makes this goal, and therefore its factor in pricing, clear. For example, the Prospectus indicates that "[t]he net proceeds from this offering and the additional financing transactions will ultimately be used by Lazard Group primarily to redeem membership interests held by the historical partners for an aggregate redemption price of approximately $1.6 billion . . . ." (*Prospectus*, Wolinsky Aff. Ex. 1 at 66.)

Another example of the linkage between the offering and the buyout of David–Weill and the historical partners appears in the section of the Prospectus entitled, "The Separation and Recapitalization Transactions and the Lazard Organizational Structure." *Id.* at 55. It states that one of the "principal parts" of the recapitalization of LAZ–MD Holdings and the Lazard Group is "the redemption of the historical partner interests" and that approximately $789 million of net proceeds from the offering would be used to complete the redemption of historical partners' interests. *Id.* The Prospectus repeatedly emphasizes the link between the IPO and the plan to buy out David–Weill and the historical partners. *(See e.g., id.* at 7, 10, 18, 55–57, 168–70) (describing the intended use of proceeds and the details of the historical partners transaction agreement). Thus, noting the absence of a particular statement from a single section of the Prospectus is not sufficient to support a claim of omission of a material fact.

### b. *Mandated Price Allegations and Road Show Results*

Plaintiffs further claim that the Prospectus did not disclose that the price had to exceed $22 per share to effectuate the buyout. This allegation, however, is at odds with the facts as stated in the Complaint. Plaintiffs note that "[i]n the IPO, Lazard planned to sell approximately one-third of the equity interest in the Company for gross proceeds of $855 million, as well as issue debt and convertible securities for an added $950 million in proceeds." (Compl.¶ 47.) Since the offering constituted a minority interest in the business, Defendants could have increased the percentage of equity to be sold in the offering from 37.5 percent, rather than maintaining the $25 share price, to boost the net proceeds; the per share price, therefore, did not have to be $22 as alleged by Plaintiffs. (*See* Lazard Def.'s Mem. in Supp. of Mot. to Dismiss, dated April 24, 2006, ("Lazard Mem.") at 20.) Thus, the Company had no obligation to include a statement among the list of price factors that was neither necessary nor true.

Plaintiffs claim that the statement above also failed to mention that "every market indication given to Defendants suggested an initial price of $21–$22 per share, as evidenced by the indications of interest submitted to the Underwriter Defendants before the IPO." (Compl.¶ 78.) Such an allegation can only translate to a claim of price overstatement, *i.e.,* that Plaintiffs paid more than the shares were worth initially and that the offer price did not mirror the alleged market indications. Related allegations in the Complaint support this conclusion. Plaintiffs claim that Defendants knew that the market "could only support an offering price in the range of $21–22" and that a " 'market' above $22 per share did not exist for Lazard stock." (*Id.* ¶¶ 80–81.)

These claims, however, ignore that there is an inherently speculative aspect to IPO prices. On the whole, the share values represent "a negotiat[ion] between [the issuer] and the representative," as stated in the Prospectus. (*Prospectus,* Wolinsky Aff. Ex. 1 at 204.) Such estimations are not guaranteed, nor could they be in light of explicit warnings provided to Plaintiffs in the Prospectus. (*See id.* at 48.)

Pursuant to the "bespeaks caution" doctrine, the misrepresentations in the Prospectus that the Plaintiffs here allege are immaterial as a matter of law because, in this Court's view, any reasonable investor would not "consider them important in light of adequate cautionary language set out in the same offering." *Halperin,* 295 F.3d at 357 (citing cases). The Prospectus expressly counsels against reliance on the negotiated price as an accurate value of the shares. For example, the Prospectus contains a section that highlights the following language:

> Because there has not yet been any public market for securities of Lazard Ltd, the market price and trading volume of our common stock may be volatile, and you may not be able to resell your shares at or above the initial offering price.
>
> . . . .
>
> "Prior to this offering, there has been no public market for our securities, including our common stock, or those of Lazard Group . . . The price of our common stock in this offering will be determined through negotiations between us and the underwriters. The negotiated price of this offering may not be indicative of the market price of the common stock after this offering. The market price of the common stock could be subject to significant fluctuations. . . ."
>
> . . . .

[S]hares of our common stock may trade at prices significantly below the price of this offering.

(*Prospectus*, Wolinsky Aff. Ex. 1 at 48.)

In light of such language, no reasonable investor could have considered the offering price as a guarantee of much other than the result of comprehensive negotiations between Lazard and the Underwriter Defendants.[2] Thus, the Court concludes that the Prospectus' alleged omission of the price that resulted from the private "road show" indications of interest is, therefore, immaterial as a matter of law.

Moreover, while Plaintiffs allege that the statement above is false and misleading because Defendants knew the market "could only support an offering price in the range of $21–22," the details provided in the Complaint fail to reflect such certainty. For example, one article indicates that the original range of the offering price, which included the $25 price per share eventually settled upon by Lazard and Goldman Sachs, "was probably a bit too high." (Compl.¶ 59.) Such an ambiguous characterization seems indicative, not of a strong inference of intent to mislead, but rather of an error in judgment. Plaintiffs also point out media sources that report the lower price of $22 per share was favored "internally" by "some bankers" and therefore deemed the higher price a "mistake." (*Id.* ¶ 84.) These facts, however, imply debate, disagreement, and perhaps, a mis-

calculation. Comprehensively, such allegations may allude to an intense negotiation process between Lazard and Goldman Sachs on behalf of the underwriting syndicate, but they simply do not go so far as to state a claim that sufficiently alleges knowing omission of a material fact.[3]

Second, Plaintiffs provide no factual allegations to support the assertion that the indications of interest actually priced the shares at $21 to $22. They do not indicate which recipients of the preliminary prospectuses estimated the value of Lazard's shares accordingly, nor do they indicate when those estimates occurred. Again, noting the preferences of "some [internal] bankers" is not sufficient to plead conclusorily that "a market for the IPO at a price of $25 per share did not exist." (*Id.* ¶¶ 59, 81(b).) Hence, Plaintiffs fail to provide sufficient particularity as to how the identified statements about the value of Lazard's stock were fraudulent.

### 2. *Manipulative Trading Allegations*

Plaintiffs' Complaint also points to the following language, which they assert is materially false and misleading:

Purchases to cover a short position and stabilizing transactions may have the effect of preventing or retarding a decline in the market price of the company's stock and, together with the imposition of the penalty bid, may stabilize, main-

---

**2.** In fact, this Court notes that should alleged misrepresentations in a stock offering be considered material even in the presence of cautionary language, "an unacceptable burden on underwriters and issuers negotiating offering prices" would be created. *IPO*, 383 F.Supp.2d at 583 n. 99. The consequence of such a holding would "effectively destroy the competitive process by which issuers search for underwriters, because no underwriter would offer to conduct an IPO at any price other than the predicted market price of the securities." *Id.* This observation reiterates the fact that the determined price agreed

upon by an issuer and an underwriter may reflect, but not necessarily mirror, the price that results from indications of interest following a "road show."

**3.** As Underwriter Defendants candidly state with respect to the negotiations between Lazard and Goldman Sachs, "[d]efendants were not required to say [in the Prospectus] who got the better of the deal." (*See* Underwriter Def.'s Mem. in Supp. of Mot. to Dismiss, dated April 24, 2006 ("Underwr. Mem." at 25.))

tain or otherwise affect the market price of shares of our common stock. As a result, the price of shares of our common stock may be higher than the price that otherwise might exist in the open market. If these activities are commenced, they may be discontinued at any time. These transactions may be effected on the NYSE, in the over-the-counter market or otherwise.[4]

(*Prospectus,* Wolinsky Aff. Ex. 1 at 205.)

■■■ Plaintiffs assert that the foregoing excerpt above failed to disclose "that Goldman Sachs would be required to engage in the manipulative trading ... to artificially bolster and sustain the price of Lazard's common stock in the post-IPO market." (Compl.¶ 80.) Plaintiffs also claim that the Prospectus is false and misleading because it does not state "that to 'create a market' and thereby manufacture an appearance that Lazard's IPO was fairly and properly priced, Goldman Sachs arranged to sell millions of shares to hedge funds with side agreements [so] that they could immediately 'flip the shares' without negative consequences such as penalty bids or being locked out of future IPOs by Goldman Sachs." (*Id.* ¶ 81.)

Plaintiffs' allegation and theory on this point seem somewhat muddled. Their import appears to be that the Prospectus is false and misleading because it failed to reveal outright that, as an integral part of the IPO transaction, Goldman Sachs was to engage in an alleged scheme of manipulative trading and artificial market-making practices. If this reading of the pleadings accurately reflects Plaintiffs' meaning, it is not clear what standard would compel the form of disclosure that Plaintiffs contend is required. Potential investors are rightfully entitled to both true and complete statements in a prospectus and to related conduct by sellers of securities that comports with the highest standards of business integrity and fair dealings.

It is doubtful, however, whether the public disclosure required by the applicable rules would demand that, in the terms of their public offerings, issuers of stock actually advertise with self-incriminating candor that they contemplate the transaction to involve unlawful market manipulation and that the sellers could be brought to task for failing to provide advance notice of the avowed, wrongful scheme, detailed with sufficient particularity. The Court knows of no warrant for such a standard. Accordingly, rather than analyze the substance of the Prospectus, the Court turns to an assessment of sufficiency of detail offered by the Plaintiffs' pleadings.

A threshold question in examining whether the pleading standard of §§ 11 and 12(a)(2) claims has been satisfied is whether those claims sound in fraud. Phrases such as "untrue statements of material facts" and "materially false and misleading statements" typically accompany fraud allegations. *See Rombach,* 355 F.3d at 172. Plaintiffs repeatedly employ such language throughout the Complaint. (*See* Compl. ¶¶ 1, 15, 37, 81, 95, 103, 105, 106.) Hence, alluding to fraud throughout the Complaint in order to allege wrongdoing, only to avoid the pleading consequences of so doing in the end, cannot succeed. "Plaintiffs cannot so facilely put the fraud genie back in the bottle." *Alstom,* 406 F.Supp.2d at 210.

---

**4.** Plaintiffs also alleged that this statement failed to disclose that the initial $25 price was significantly higher than the true level of demand for Lazard stock and that the Prospectus did not indicate that a market for the IPO at the price of $25 per share did not exist. (Compl.¶¶ 80–81.) Since this argument was addressed above in Part IV.A.1.b, the analysis here will focus only on the omissions relating to manipulative trading.

To satisfy the pleading standards of Rule 9(b) requires identification of the alleged fraudulent statements, an indication from the Plaintiffs as to why those statements were fraudulent, specification of who made those statements, and details noting where and when the statements were made. *See In re Scholastic Corp. Sec. Litig.*, 252 F.3d 63, 69–70 (2d Cir. 2001); *see also Mills*, 12 F.3d at 1175. To meet these standards, Plaintiffs lean heavily, if not entirely, upon media reports from various sources. (*See* Compl. ¶¶ 42, 44, 46–50, 59, 66, 69–70, 74–75, 84, 88.) While use of such sources is permissible in pleadings, Plaintiffs are not otherwise relieved of their burden to "adequately identify and link the sources … with the allegations of misconduct…derived from those sources." *Tracinda Corp. v. DaimlerChrysler AG*, 197 F.Supp.2d 42, 81 (D.Del.2002). In other words, the news articles cited still must indicate particularized facts about Defendants' conduct in order to support the Plaintiffs' claims. With respect to claims about misstatements or omissions related to the alleged trading scheme, Plaintiffs' efforts fail for several reasons.

As the Underwriter Defendants point out, the Complaint does not identify any specific sales of shares to hedge funds that were allegedly "flipped" immediately after the IPO, nor does it indicate to whom the shares were sold. (Underwr. Mem. at 8.) One of Plaintiffs' sources makes broad reference to Goldman Sachs' sale of "many of the shares to hedge funds with quick trigger fingers," but says nothing more about the sales to "flippers." (Compl.¶ 66.) Moreover, that source then characterizes the post-IPO conduct of Goldman Sachs as typical of decisions that "underwriters often [make], to try to establish a floor for the stock by buying up the shares." *(Id.)* Another media source put forth by Plaintiffs states that Goldman Sachs sold much of the Lazard IPO to "flippers," but makes no mention of facts that would support claims of "purposeful" sales alleged by Plaintiffs. (*Id.* ¶ 69.) Viewed in its totality, the Complaint does little more than hint at pre-IPO sales volume and does not provide sufficient detail to satisfy Rule 9(b) pleading standards.

The same is true of Plaintiffs' description of Goldman Sachs' purchases after the IPO. Throughout the Complaint, Plaintiffs list substantial purchases of Lazard stock by Goldman Sachs and note that those purchases are "far from typical." (*Id.* ¶¶ 13, 67, 68, 70, 71, 74.) As with the pre-IPO sales, however, Plaintiffs provide no particularized facts other than the volume of stocks purchased; such conclusory statements are not adequate to allege an omission or misstatement with respect to manipulative trading to inflate the price of Lazard's stock.

Thus, the Complaint as to the Lazard Defendants and Underwriter Defendants fails to state a claim with respect to a material misstatement or omission pursuant to §§ 11 and 12(a)(2). In that the claims against individual defendants under § 15 of the 1933 Act depend upon an adequate pleading by Plaintiffs with respect to §§ 11 and 12(a)(2), the § 15 claims are dismissed as to both groups of Defendants. *See In re Merrill Lynch & Co., Inc. Research Reports Sec. Litig.*, 289 F.Supp.2d 429, 437 (S.D.N.Y.2003) (holding that "[b]ecause Plaintiffs have failed to state a claim against Defendants for a primary violation of the federal securities law, their claims for control person liability must necessarily fail.")

## B. MARKET MANIPULATION ALLEGATIONS

As referenced briefly above, Plaintiffs allege that Goldman Sachs, Lazard, and the Individual Defendants engaged in a manipulative scheme to artificially inflate the price of Lazard' s common stock by

requiring that Underwriter Defendants purchase significant amounts of stock both in the IPO and in the aftermarket. (Compl.¶¶ 86, 126.) Plaintiffs outline three general characteristics of the scheme: (1) misleading the investing public regarding demand for shares of Lazard stock in the IPO; (2) manipulating Lazard' s share price in the post-IPO market so as to create an appearance of false demand; and (3) late filing of the required SEC registrations that detailed the extent of Goldman Sachs' ownership of, and trading in, Lazard stock. *(See id.* ¶ 87.) They also claim that Goldman Sachs, Lazard, and the Individual Defendants "knowingly and recklessly participated in acts, transactions, practices, and courses of business that operated as a fraud and deceit upon Plaintiffs." *(Id.* ¶ 123.)

In response, Underwriter Defendants allege that Plaintiffs have not complied with Rule 9(b); that setting the offering price "too high" does not state an actionable claim; that sales of IPO shares to "flippers" are not actionable; that the post-IPO purchases of Lazard shares by Goldman Sachs are not actionable; and that the alleged fraud makes no economic sense. (Underwr. Mem. at 7–13.) There is some overlap between these arguments and the responses by both sets of Defendants to the alleged violations of the 1933 Act. Accordingly, the Court addresses only those arguments not already discussed and resolved above in Section IV.A.

Under Rule 9(b), a claim of market manipulation requires that the Complaint specify "what manipulative acts were performed, which defendant performed them, when the manipulative acts were performed, and what effect the scheme had on the market for the securities at issue." *Sec. and Exch. Comm'n v. U.S. Envtl., Inc.,* 82 F.Supp.2d 237, 240 (S.D.N.Y.2000) *(quoting T.H.C., Inc. v. Fortune Petroleum Corp.,* 1999 WL 182593, at *3

(S.D.N.Y. March 31, 1999)). Since the facts in a manipulation scheme are often known only to the defendants, market manipulation claims are "subject to a more relaxed pleading standard than other claims involving alleged affirmative misrepresentations." *Sedona Corp. v. Ladenburg Thalmann & Co.,* 2005 WL 1902780 at *10 (S.D.N.Y. Aug.9, 2005). Regardless, pleading a market manipulation scheme requires that Plaintiffs state "the circumstances constituting fraud ... with particularity." *Catton v. Def. Tech. Sys.,* 457 F.Supp.2d 374, 381 (S.D.N.Y.2006).

### 1. *Pricing and Purchases*

■ The linchpin of Plaintiffs' claims regarding manipulative acts rest on two allegations—that Defendants intentionally set the price of Lazard stock beyond what the market would bear and that the purchases by Goldman Sachs were attempts to dominate and control Lazard's public float in the IPO aftermarket. Neither claim is sufficiently supported by the particulars.

As the Court pointed out above with respect to how prices are set in an IPO, that process entails aspects that are speculative and reflect the result of negotiations between the underwriters and the issuers. In consequence, IPO pricing is not necessarily determined by the "natural interplay of supply and demand" because no such interplay has yet taken place. *See Gurary v. Winehouse,* 190 F.3d 37, 45 (2d Cir.1999) (noting that a market must exist prior to allegations of its manipulation); *see also Bangor Punta Corp. v. Chris–Craft Indus., Inc.,* 337 F.Supp. 1147, 1153 n. 12 (S.D.N.Y.1971) ("[T]he essence of a manipulation is the execution of transactions affecting prices or actual or apparent market activity for the purpose of inducing others to buy or sell.")

Moreover, the facts offered by Plaintiffs to demonstrate that the market "could only support an offering in the price range of $21–22," and therefore that Defendants participated in a fraudulent scheme in establishing a higher price, are belied by the details cited in the Complaint. As noted above, one news article quoted statements from sources indicating that the Lazard IPO price "was probably a bit too high" and a "mistake." (Compl.¶ 59.) Plaintiffs also refer to published statements indicating that a lower price was favored "internally" by "some bankers." (Id. ¶ 84.) However, noting the preferences of some bankers and a potential pricing error or poor business judgment by Defendants does not sufficiently fill the gaps in the pleadings necessary to allege a manipulative scheme, nor does it give rise to a sufficiently strong inference of fraud and deceit.

The same is true with respect to the pre- and post-IPO purchases by Goldman Sachs of Lazard stock. As noted above, Plaintiffs provide detail as to the volume of stock purchased by Goldman Sachs, but do not connect it to facts that evince a fraudulent scheme, nor do they reference any agreement among Defendants in which Goldman Sachs took part.[5]

## 2. Scienter

■ Rule 9(b) also requires that Plaintiffs put forth more than "conclusory allegations" to satisfy the scienter pleading requirement of § 10(b) claims. See Shields v. Citytrust Bancorp, Inc., 25 F.3d 1124, 1129 (2d Cir.1994). Proof of scienter requires either "alleging facts to show that defendants had both motive and opportunity to commit fraud" or "alleging facts that constitute strong circumstantial evidence of conscious misbehavior or recklessness." See Kalnit, 264 F.3d at 138. To impute knowledge to the Defendants, Plaintiffs assert that:

● Goldman Sachs "knew that the market would trade Lazard's shares between $21 and $22 a share in the aftermarket" (Compl.¶ 59);

● Goldman Sachs "knew that the initial $25 per price was well above the $21–22 per share that the market would accept pre-IPO" (id. ¶ 67);

● Goldman Sachs "knew that it was assuming the risk of absorbing the difference between the initial price and the price at which the stock would legitimately trade" (id.);

● Defendants "knew ... [that] the true level of demand for Lazard stock, ... could only support an offering price in the range of $21–22" (id. ¶ 80(a)); and

● Defendants "knew that Goldman Sachs would be required to engage in manipulative trading alleged herein to artificially bolster and sustain the price of Lazard's common stock in the post-IPO market" (id. ¶ 80(b)).

■ Repeated conclusory allegations such as these do not satisfy Rule 9(b) pleading standards. See Shields, 25 F.3d at 1129 ("[Plaintiff's] frequent conclusory allegations—that Defendants 'knew but concealed' some things, or 'knew or were reckless in not knowing' other things—do not satisfy the requirements of Rule 9(b).

---

5. Plaintiffs also point to Rule 104 of Regulation M of the Exchange Act which provides that "[n]o stabilizing shall be effected at a price that the person stabilizing knows or has reason to know is in contravention of this section or is the result of activity that is fraudulent, manipulative, or deceptive under the securities laws, or any rule or regulation thereunder." 17 C.F.R. § 242.104(a). They allege that Goldman Sachs' conduct violated this provision. In that Plaintiffs have not sufficiently alleged facts indicating that the aftermarket purchasing by Goldman Sachs violated the anti-fraud provisions of the Exchange Act, however, this claim also fails under Rule 12(b)(6).

We have held in the context of securities fraud claims that such allegations are 'so broad and conclusory as to be meaningless.' "). Plaintiffs, for example, do not explain how any of the Defendants came to know how or under what actionable circumstances the initial $25 per share price was "too high." With respect to the Underwriter Defendants, Plaintiffs do not allege that each Underwriter had access to and reviewed indications of investor interest in the IPO, nor that each Underwriter independently concluded, based on those indications of interest, that the $25 price per share was "artificially inflated" but nonetheless agreed to it at a later date. Moreover, Plaintiffs do not describe what role each of the Underwriter Defendants may have had in the process by which the IPO price was negotiated with Lazard.[6] *See Castillo v. Dean Witter Discover & Co.*, 1998 WL 342050, at *12 (S.D.N.Y. June 25, 1998) ("Rule 9(b) and PSLRA require plaintiffs to allege with particularity the role each defendant played in any fraudulent scheme, and why each defendant should be liable for the material omitted from the prospectuses.")

Plaintiffs' claims also fail to specifically allege sufficient facts regarding the motive element of the scienter requirement. Such a claim requires description of specific benefits that could result from the fraud. *See Novak*, 216 F.3d at 307. A defendant is presumed to act in his or her own best economic interest. *See Shields*, 25 F.3d at 1130. According to Plaintiffs, all of the Defendants "knew" that there was demand for the shares only at $21 to $22 per share. If this allegation is true, then, as Defendants respond, Goldman Sachs and the other Underwriter Defendants agreed from the start to assume a loss of at least $1.75 per share on approximately 34.2 mil-

lion shares of Lazard stock. This allegation contradicts not only common sense, but also any inference of scienter because it requires Goldman Sachs to agree to forego from $82 to $112 million—the difference between the $23.75 per share for 34.2 million shares and $21 to $22 per share for 34.2 million shares.

Plaintiffs nonetheless note that "this was a firm commitment underwriting," meaning that "if the underwriters could not sell the shares of stock that they had committed to sell, they would be forced to keep the unsold shares for themselves and absorb any associated losses." (Compl.¶ 9.) Plaintiffs assert that Goldman Sachs stood to reap millions of dollars in banking and underwriting fees. *(See id.* ¶ 86.) However, the $43 million in underwriting fees, divided among all of the Underwriter Defendants, is substantially less than the losses that were, under Plaintiffs' theory, sustained by Defendants in the short term. In fact, since underwriting fees increase with any higher IPO price, Plaintiffs' theory to show motive to commit fraud is further undercut. *See Geiger v. Solomon–Page Group, Ltd.*, 933 F.Supp. 1180, 1190–91 (S.D.N.Y.1996) ("[Defendant's] alleged motive to earn its underwriting commission is not alone sufficient to sustain a strong inference of fraudulent intent.")

Plaintiffs also reference the desire by Goldman Sachs to secure future business from the Company. The Second Circuit has found such potential benefits to be too speculative to offset the significant losses that would result from purposefully overpriced shares. *See Chill v. General Elec. Co.*, 101 F.3d 263, 268 (2d Cir.1996) (holding that the desire to maintain the appearance of success and corporate profitability was insufficiently concrete to qualify as

---

6. This deficiency occurs throughout the Complaint as Plaintiffs focus almost exclusively on Goldman Sachs and make little mention of acts conducted or statements made by remaining Underwriter Defendants.

motive); *see also In re Crystal Brands Sec. Litig.*, 862 F.Supp. 745, 749 (D.Conn. 1994) (finding that allegations of a company's motive to "maintain good relations with suppliers, retailers and lenders" are flawed because "they pertain to virtually any company that manufactures and distributes goods"). Thus, the motive allegations as to Underwriter Defendants do not satisfy Rule 9(b) pleading standards.

Finally, Plaintiffs do not identify any specific act taken by the Lazard Defendants with respect to their market manipulation claims, but rather include them in general assertions regarding the alleged fraudulent scheme. *(See* Compl. ¶¶ 92, 124, 146.) Without more specific indications of the behavior of the Lazard Defendants, the Complaint does not satisfy the pleading standards of Rule 9(b) and the PSLRA. *See Scone Invs., L.P. v. Am. Third Mkt. Corp.*, 1998 WL 205338, at *4 (S.D.N.Y. Apr.28, 1998). ("[A] complaint may not rely upon blanket references to the acts of all the defendants without identifying the nature of each defendant's participation in the fraud.").[7]

To the extent that Plaintiffs have failed to sufficiently allege predicate violations of § 10(b), the control person claims within the meaning of § 20(a) of the Exchange Act also fail. *See Sec. and Exch. Comm'n v. First Jersey Sec., Inc.*, 101 F.3d 1450, 1472 (2d Cir.1996).[8]

## C. *LEAVE TO REPLEAD*

When a cause of action is dismissed because of pleading deficiencies, the usual remedy is to permit plaintiff to replead his or her case. *See* Fed.R.Civ.P. 15(a) ("[L]eave [to replead] shall be freely given when justice so requires.") Such a policy is especially appropriate when claims are dismissed under Rule 9(b) because the law favors resolving disputes on their merits. *See Acito*, 47 F.3d at 54–55. While such an action is more likely when a claim has been dismissed as a matter of law or where leave to amend or replead has been repeatedly granted, the determination is within the Court's discretion. *See Porat v. Lincoln Towers Cmty. Ass'n*, 464 F.3d 274, 276 (2d Cir.2006); *see also In re Initial Pub. Offering Sec. Litig.*, 241 F.Supp.2d 281, 397 (S.D.N.Y.2003) (indicating that granting permission to replead is within the Court's purview).

Lazard Defendants argue that Plaintiffs should be denied leave to replead and that the Court should impose sanctions. At this stage, the Court finds such actions premature, especially where Plaintiffs' claims are dismissed for lack of particularity. Therefore, the Lazard Defendants' request to deny leave to replead and impose sanctions is denied.

## V. *ORDER*

For the foregoing reasons, it is thereby

**ORDERED** that the motion (Docket No. 38) of Lazard Ltd. ("Lazard" or the "Company") and Lazard Freres & Co. ("Lazard Freres") to dismiss the Complaint herein is GRANTED with respect to all claims pled in this action brought by

---

**7.** As Plaintiffs have failed to allege both the false and misleading statement and scienter elements required in order to sufficiently state a claim under § 10(b), Rule 10b–5, and pursuant to Rule 9(b), the Court does not need to address whether Plaintiffs adequately pleaded the elements of causation.

**8.** The absence of facts giving rise to a strong inference of scienter also weaken Plaintiffs'

allegations regarding the late SEC filing. (Compl.¶ 72.) Plaintiffs have not pled particularized facts showing that the alleged late filing was fraudulent, rather than inadvertent. Without the particularity required to satisfy the scienter requirement, a mere delay in providing information to the public does not support a sufficient factual basis for a securities claim. *See Acito*, 47 F.3d at 53.

lead plaintiffs, Diana B. Lien, Charles F. Lin, and Edward Schonberg, and plaintiffs Lawrence O. Viands and Nanette Katz (collectively, "Plaintiffs") under the Securities Act of 1933, 15 U.S.C. § 77a et seq.; and under the Exchange Act of 1934, 15 U.S.C. § 78a et seq.; and it is further

**ORDERED** that the motion (Docket No. 42) of Goldman Sachs & Co. ("Goldman Sachs"); Citigroup Global Markets Inc. ("Citigroup"); Merrill Lynch, Pierce, Fenner & Smith, Inc. ("Merrill Lynch"); Morgan Stanley & Co., Inc. ("Morgan Stanley"); Credit Suisse First Boston LLC ("Credit Suisse"); and J.P. Morgan Securities Inc. ("J.P. Morgan") to dismiss the Complaint herein is GRANTED with respect to all claims pled by Plaintiffs under the Securities Act of 1933, 15 U.S.C. § 77a et seq.; and under the Exchange Act of 1934, 15 U.S.C. § 78a et seq.;

**ORDERED** that all claims brought by Plaintiffs herein against Bruce Wasserstein, Steven J. Golub, Michael J. Castellano, and Scott D. Hoffman alleging a cause of action under Section 15 of the Securities Act are DISMISSED; and it is further

**ORDERED** that all claims brought by Plaintiffs herein against Bruce Wasserstein, Steven J. Golub, Michael J. Castellano, and Scott D. Hoffman alleging a cause of action under Section 20 of the Exchange Act are DISMISSED; and it is further

**ORDERED** that the motion of Lazard Ltd. and Lazard Freres to impose sanctions and deny leave to replead is DENIED; and it is finally ORDERED that Plaintiffs are granted leave to file, by not later than twenty (20) days from the Date of this Order, an amended complaint repleading any of the claims dismissed herein.

All motions entered in the docket sheets for related and consolidated cases, 05 Civ. 5785, 05 Civ. 5879, 05 Civ. 6111, 05 Civ. 6398, and 05 Civ. 6419, should similarly be removed from the Court's docket.

**SO ORDERED.**