# United States Court of Appeals
## FOR THE EIGHTH CIRCUIT

_____

No. 06-2590

_____

| | | |
|---|---|---|
| Farmers Bank of Hamburg, Arkansas, | * | |
| | * | |
| Appellant, | * | |
| | * | Appeal from the United States |
| v. | * | District Court for the |
| | * | Eastern District of Arkansas. |
| United States Department of | * | |
| Agriculture; Mike Johanns,[1] | * | |
| Secretary of Agriculture, | * | |
| | * | |
| Appellees. | * | |

_____

Submitted: December 11, 2006
Filed: July 19, 2007

_____

Before WOLLMAN, BEAM, and RILEY, Circuit Judges.

_____

RILEY, Circuit Judge.

The Farmers Bank of Hamburg, Arkansas (Bank) appeals the district court's order affirming the decision of the Rural Business-Cooperative Service (the Agency)[2]

_____

[1] Mike Johanns is automatically substituted for his predecessor, Ann Veneman, pursuant to Federal Rule of Appellate Procedure 43(c)(2).

[2] The Rural Business-Cooperative Service is part of the Rural Development Agency, which is part of the United States Department of Agriculture.

denying the Bank's loss claim for loans guaranteed by the Agency. We affirm in part and reverse in part.

## I.    BACKGROUND

In 1998 and 1999, the Hermitage Tomato Co-operative Association (Co-op), a cooperative of tomato growers, obtained nine loans totaling $9,604,860 from the Bank. The Agency guaranteed the loans up to 90% of their value. The Bank closed the loans in three separate phases, each phase consisting of three loans. Phase I and Phase II loans closed in March of 1998 and 1999, respectively. Phase I loans totaled $3,000,000 and Phase II loans totaled $1,849,702.

Sometime after the 1999 summer growing season, but before the Bank obtained the Co-op's financial statements for the 1999 fiscal year, the Co-op and the Bank began discussing the possibility of a third loan, the Phase III loans, for an amount exceeding $4,000,000. The purpose of these loans was, among other things, to enable the Co-op to expand its operations to a year-round business by including a supply and convenience store.

By December 13, 1999, the Co-op was delinquent in loan payments in the amount of $447,701.29 on Phase I and Phase II loans. The Bank's president, Dan Wingard (Wingard), wrote a letter on December 13, 1999, to the Agency reporting the Co-op's delinquencies. In his letter, Wingard also informed the Agency the Co-op had made arrangements to cure the delinquencies. The Agency, however, would not issue the Phase III loan guarantees due to the Co-op's delinquencies.

Based on the Agency's position regarding the Co-op's delinquencies, the following events took place on or about December 21, 1999: (1) the Co-op deposited $450,480 into its operating account from bridge loans, which consisted of a $300,000 check from the Co-op's law firm and three checks totaling $150,480 from an

individual;[3] (2) the Bank submitted a lender's certification to the Agency, stating there had been no material adverse change in the Co-op's financial condition; (3) the Agency issued a conditional commitment to guarantee the Phase III loans giving the Co-op one year to meet certain conditions; (4) the Bank closed the Phase III loan agreement; and (5) the Co-op repaid most of the bridge loans.

Before issuing the Phase III loans, the Bank had not yet received the Co-op's 1999 fiscal year audited financial statements. The Agency regulations required the Bank to submit the financial statements to the Agency within 120 days after the close of the Co-op's fiscal year (August 31). When the Bank received the Co-op's financial statements in February 2000, the statements showed a loss of $747,000. The statements also revealed the Co-op failed to meet other conditions under the Agency's guarantees, including a minimum asset/liability ratio, minimum accounts receivable or cash on hand, and a 10% tangible balance sheet equity.

In November 2000, due to a poor growing season, Wingard requested that the Agency extend the Co-op's one-year deadline, set to expire on December 21, 2000, to meet the conditions previously set forth in the Agency's conditional commitment for the guarantee of the Phase III loan.

On January 3, 2001, the last day of Wingard's employment with the Bank, Wingard wrote to the Agency and requested the issuance of the Phase III loan guarantee. Wingard represented to the Agency that the Co-op had met all the requirements of the conditional commitment with the exception of the 10% equity requirement, which Wingard requested the Agency waive. Wingard also requested

---

[3]The parties refer to these deposits as bridge loans, and the Co-op used the proceeds of the bridge loans to pay its delinquencies on Phase I and Phase II loans. When the Co-op received the bridge loans, the Co-op had an operating account balance of less than $10,000.

that the Agency restore $580,348 of the Co-op's working capital from the Phase I and Phase II loans.

The Agency denied Wingard's request for restoration of the working capital, but agreed to guarantee the Phase III loan if the Co-op could raise $580,000. In February 2001, the Bank, in conjunction with another bank, agreed to loan the Co-op $580,000,[4] and the Agency issued the Phase III loan guarantee.

The Co-op eventually defaulted on all the loans. The Bank hired an independent accounting firm to investigate the Co-op's finances and activities. In a report dated September 20, 2002, the accounting firm revealed the Co-op's working capital had been mismanaged from 1998 to 2001 in a manner that directly benefitted Co-op members, but depleted funds available to pay loan debt. The accounting report also indicated Co-op members made contributions in the form of notes receivable totaling $1.3 million that were used as collateral for the Co-op loans. A portion of the notes receivable had been written off and some were past due. The accounting report further indicated the Co-op made payments to its members on several occasions in violation of policies and procedures under the Agency's conditional commitments for the Co-op's loan guarantees.

On December 18, 2002, the Bank submitted to the Agency a loss claim of $7,442,317.70, specifically, (1) Phase I loan losses of $1,856,294.45; (2) Phase II loan losses of $1,210,528.60; and (3) Phase III loan losses of $4,375,494.65.

On December 19, 2002, the Bank filed a lawsuit in state court against Wingard and the Co-op. The Bank alleged, among other things, Wingard and the Co-op conspired to commit fraud. The Bank specifically alleged Wingard violated his

---

[4]The loan commitment included many restrictions, and the Co-op never actually received the full $580,000.

fiduciary duties to the Bank. The Bank asserted, when the Bank closed the Phase III loans, Wingard and the Co-op used the bridge loans to conceal the fact the Co-op failed to meet the Agency's requirements. The Bank claimed Wingard and the Co-op fabricated assets to serve as collateral for the Co-op's loans.

On July 23, 2003, the United States Department of Agriculture's Office of Inspector General (OIG) issued an audit report recommending the Agency "take action to contest the guarantees, or substantially reduce the remaining balance of the loan [] guarantees totaling $6,993,578." The audit report, in relevant part, stated:

> Specifically, we found that the lender: Processed guaranteed loans to an ineligible borrower, allowed the borrower to use guaranteed funds to pay delinquent Federal debt, allowed the borrower to use guaranteed loan funds for unauthorized purposes, failed to adequately supervise the construction of the borrower's facilities, and allowed the borrower to divert working capital away from the co-operative.

Based on this report, the Agency, on August 29, 2003, denied the Bank's loss claim, finding the Bank was negligent in servicing the loans. The Bank unsuccessfully appealed to the National Appeals Division (NAD). The Bank then appealed, in accordance with the provisions of the Administrative Procedure Act, 5 U.S.C. §§ 701-706, to the district court requesting review of the Agency's final decision. The district court upheld the Agency's decision. This appeal followed.

## II.    DISCUSSION
### A.    Standard of Review

"When reviewing the district court's opinion upholding the administrative agency's decision, this court must render an independent decision on the basis of the same administrative record as that before the district court." Mages v. Johanns, 431 F.3d 1132, 1139 (8th Cir. 2005) (quotations omitted). "We will set aside an agency's decision if it [is] arbitrary, capricious, an abuse of discretion, or otherwise not in

accordance with law." Id. "We accord substantial deference to an agency's interpretation of its own regulation . . . unless the interpretation is plainly erroneous or inconsistent with the regulation." Id. (quotation omitted).

### B. Regulations and Loan Guarantee

Under the Agency's regulations, all lenders obtaining or requesting a loan guarantee are responsible for servicing guaranteed loans in a prudent manner, including liquidation, if necessary. The regulations specifically provide:

> The lender is responsible for servicing the entire loan and for taking all servicing actions that a prudent lender would perform in servicing its own portfolio of loans that are not guaranteed. *The Loan Note Guarantee is unenforceable by the lender to the extent any loss is occasioned by . . . use of loan funds for unauthorized purposes, negligent servicing,* or failure to obtain the required security interest *regardless of the time at which the Agency acquires knowledge of the foregoing.* This responsibility includes but is not limited to the collection of payments, obtaining compliance with the covenants and provisions in the Loan Agreement, [and] obtaining and analyzing financial statements. . . .

7 C.F.R. § 4287.107 (emphasis added).

> The lender must submit annual financial statements to the Agency within 120 days of the end of the borrower's fiscal year. The lender must analyze the financial statements and provide the Agency with a written summary of the lender's analysis and conclusions, including trends, strengths, weaknesses, extraordinary transactions, and other indications of the financial condition of the borrower.

Id. § 4287.107(d).

As a condition for obtaining loan guarantees, the Bank entered into a Lender's Agreement with the Agency. This agreement, in relevant part, provides:

*The Loan Note Guarantee will be unenforceable by the Lender to the extent any loss is occasioned by . . . negligent servicing,* or failure to obtain the required security *regardless of the time at which USDA acquires knowledge of the foregoing.* Any losses will be unenforceable by the Lender to the extent the loan funds are used for the purposes other than those specifically approved by USDA in its Conditional Commitment for Guarantee. Negligent servicing is defined as the failure to perform those services which a reasonably prudent Lender would perform in servicing its own portfolio of loans that are not guaranteed. The term includes not only the concept of a failure to act but also not acting in a timely manner.

. . . .

[The Lender is responsible for o]btaining from the Borrower periodic financial statements as required in the loan agreement with the borrower. At a minimum, annual financial statements must be forwarded by the lender, with a credit analysis, to the USDA servicing office within 120 days of Borrowers [*sic*] fiscal year end.

(Emphasis added).

### C. Phase III Loans

With these regulatory provisions and agreement duties in mind, we first consider whether the Agency properly denied the Bank's loss claim regarding the Phase III loans on the ground the Bank was negligent in servicing the loan. The NAD agreed with the Agency, finding that if the Bank had complied with the regulations, the Bank would have obtained the Co-op's audited financial statements before closing the Phase III loans. Before the Bank approved the Phase III loans, the Co-op was in default on Phase I and Phase II loans, and the Bank was aware the Co-op was essentially borrowing to pay its delinquencies on the Phase I and Phase II loans. The regulations provide:

> *Credit evaluation.* This is a key function of all lenders during the loan processing phase. The lender must analyze all credit factors associated with each proposed loan and apply its professional judgment to determine that the credit factors . . . ensure loan repayment.

7 C.F.R. § 4279.30(b). The Bank finalized the Phase III loans in December 1999, but the Bank did not receive the Co-op's audited financial statements until February 2000. Considering the Co-op's known financial difficulties, and suspect credit worthiness, a reasonably prudent lender would not have loaned the Co-op over $4,000,000 more without first receiving the Co-op's audited financial records. The Bank clearly neglected to keep apprised of the Co-op's financial condition. Contrary to the Bank's assertion, a causal nexus exists between its failure to act as a reasonably prudent lender and the Phase III loans' losses.

The Bank makes several arguments attempting to avoid responsibility for its failure to act as a prudent lender. First, the Bank tries to disassociate itself from Wingard's actions, claiming its Board of Directors was never aware of the Co-op's true economic state. However, as the district court notes, the Bank is ultimately responsible for the negligent acts of its agents and employees made within the scope of their employment. William Edward Johnson (Johnson), the Bank's general counsel and a member of the Bank's Board of Directors, admits the Bank knew it bore the responsibility to be aware of the Co-op's true financial condition. Johnson stated, once the Bank received the Co-op's audited financial statements, the Bank's Board of Directors was upset and talked "to Dan Wingard about this is [his] baby, *not meaning it was his total responsibility.*"

Second, the Bank attempts to shift responsibility to the Agency, stating the Agency knew about the Co-op's losses when the Agency issued its guarantee. The Agency, however, was unaware of two very important aspects of the Phase III loans, namely, (1) the Co-op intended to use the proceeds of the Phase III loans to refinance (by indirectly paying the delinquencies of) the Phase I loans and Phase II loans, and

(2) the purpose of the $580,000 loan the Bank made to the Co-op for working capital was merely to induce the Agency to issue its guarantee. The Bank ignored the Co-op's poor credit worthiness, as well as the purpose of the bridge loans, to obtain a guarantee of the Phase III loans.

The Bank claims the bridge loans were proper and, since one of the purposes of the Phase III loans was to obtain working capital, the Co-op did nothing improper by paying back the bridge loans with Phase III loan proceeds. The propriety of the bridge loans, however, is irrelevant to this inquiry. The problem is neither the Bank nor the Co-op informed the Agency that one purpose of the Phase III loans was to refinance Phase I and Phase II loans by paying the delinquent bridge loans. Furthermore, before the Agency's issuance of the Phase III loans guarantee, a material change in the Co-op's financial condition occurred, that is, the Co-op increased its liabilities by borrowing a half-million dollars. The Bank misled the Agency when it reported there were no material changes in the Co-op's financial condition. Quite simply, the Agency never authorized Phase III loan proceeds to bring Phase I loans and Phase II loans current.

Next, the Bank contends the NAD erred in its decision because it failed to recognize the construction of the Co-op's convenience store (built approximately 1,000 square feet smaller than expected) did not result in a monetary loss. The NAD, however, never considered the store's smaller size a loss. The NAD stated, neither the fact the store was built smaller than expected nor the possible resulting damages was the issue. The issue, as the NAD indicated, was whether the Bank complied with its regulatory duties to supervise the construction of the convenience store. See 7 C.F.R. §§ 4279.30(a)(1)(v), 4279.156(b). The fact the store was built smaller, and contrary to the project's specifications, is simply another illustration of the Bank's failure to comply with its duties under the regulations.

Finally, the Bank claims the OIG's report is inaccurate because it is based upon a report of an independent accounting firm hired by the Bank. This claim is meritless,

first, because the Bank relies upon the same report to support its allegations against Wingard in the state lawsuit. Second, the record indicates the OIG's report was the product of a comprehensive review of records from the Agency, the Bank, and the Co-op.

### D.    Phase I and Phase II Loans

We next consider whether the Agency properly denied the Bank's loss claims regarding the Phase I and Phase II loans. The Agency states it denied the claims because the Bank was negligent in servicing these loans. However, the record does not contain sufficient evidence to prove the Bank's negligence or the necessary causation regarding any negligent servicing of these loans in order to demonstrate what particular losses proximately resulted from any of the Bank's actions or inactions. The record contains only two facts the Bank could have known concerning the Co-op's financial condition when these loans were issued in March 1998 and March 1999, namely, (1) the Co-op did not charge members processing fees for the 1998 crop and absorbed a $79,000 loss, and (2) the Co-op sustained losses for the 1998 growing season because of a power failure. The Agency's decision to deny the Bank's loss claims regarding the Phase I and Phase II loans does not explain with any degree of specificity or factual support how the Bank failed to act as a reasonably prudent lender in servicing those loans sufficient to warrant a total denial of the loss claims.

The Agency contends the Bank's monitoring was negligent, and the Bank could have, should have, and would have discovered the Co-op's mismanagement, violations of loan provisions, and inadequate funding had the Bank not been negligent. This contention is mere conjecture. Assuming the Bank's supervision were negligent, calculating that discovery would have avoided all the losses, or even some of the losses, would be sheer speculation on this record. The Bank was not operating the Co-op and, other than making suggestions, threats, and demands, could only declare a default and pursue collection. The record contains no evidence regarding how declaring a default at any particular time would have affected the Co-op's financial

condition and ability to repay the loans. The Agency's principal witness testified the Co-op's mismanagement and diversions "may have been prevented" "in part." The hearing officer found "[i]t is not to say [the Bank] could have prevented Co-op financial problems, but proper servicing and oversight could have substantially reduced financial losses to both [the Bank] and [the Agency]." How? And how much? The record does not answer either question. The Agency failed to meet its own regulation and its contractual obligation to show "the extent any loss [was] occasioned by . . . negligent servicing." 7 C.F.R. § 4287.107; Lenders Agreement Business and Industry Guaranteed Loan Program, ¶ IB. With respect to the Phase I and Phase II loans, the Agency's decision is not supported by substantial evidence.

## III. CONCLUSION

Based on the foregoing, we affirm the district court's order with respect to the Phase III loans, but reverse with respect to the Phase I and Phase II loans. This case is remanded to the district court with instructions to remand to the Agency for further proceedings consistent with this opinion.

_____