# United States Court of Appeals
## FOR THE EIGHTH CIRCUIT

_____

No. 07-2843

_____

Harlan Anderson,            *
                                   *

         Appellant,        *

                                   *    Appeal from the United States

      v.                         *    District Court for the District

                                   *    of Minnesota.

Farm Service Agency of the      *

United States Department        *

of Agriculture,              *

                                   *

         Appellee.         *

_____

Submitted: May 15, 2008
Filed: July 18, 2008

_____

Before LOKEN, Chief Judge, BEAM, and BYE, Circuit Judges.

_____

BEAM, Circuit Judge.

Harlan Anderson appeals the district court's[1] ruling affirming the Farm Service Agency's (FSA) decision regarding his crop disaster payments. Because the agency's action was not arbitrary, capricious, or otherwise contrary to law, we affirm.

_____

[1]The Honorable Ann D. Montgomery, United States District Judge for the District of Minnesota.

## I.      BACKGROUND

Anderson is a Wright County, Minnesota, farmer who sustained weather-related losses to his 2002 alfalfa crop. During the 2002 season, Anderson carried group risk insurance, which was reinsured by the Federal Crop Insurance Corporation (FCIC). Anderson switched to the group plan for the 2001 year. In previous years, he was insured through multiple peril crop coverage. Multiple peril insurance is designed to protect against each individual's loss. When Anderson purchased multiple peril insurance, he had to keep individual yearly yield records of his actual production history (APH). If he had not kept such records and suffered a loss, he would have been paid based on a yield assigned by the FCIC. In contrast, the Group Risk Plan is not designed to protect against individual loss and does not require the same paperwork. When he switched from multiple (individual) peril to group protection, Anderson signed a disclaimer noting that the new plan was different from a multiple peril/actual production history policy because it did not insure against individual loss and instead, payments would be based upon county-wide yields. The disclaimer suggested that he should continue to maintain his production history in the event that he wished to switch back to a production history/multiple peril plan in the future. Anderson did, apparently, keep such APH records even while he participated in the group plan, which did not require this information.

In July or August 2003, after the 2002 weather problem, Anderson applied for benefits from the FSA under the 2002 Crop Disaster Program.[2] In his application, Anderson argued that his benefits should be calculated according to his insurance-related APH, which he listed as 4.8 tons per acre, at a rate of $111 per ton, for a total of $61,948.82. The FSA approved his application generally, but a dispute arose about

---

[2]Although the record is hazy on the matter, the parties appear to concede that Anderson applied for, and received, insurance benefits from the group plan based on the 2002 crop misfortunes.

the amount of payment–specifically, whether or not Anderson was entitled to an adjustment for diminished quality under the Quality Loss Program. In February 2004, the FSA informed Anderson that he was entitled to $14,169 in benefits under the disaster program for the losses. In calculating this amount, the FSA used a county average yield of 3.7 tons per acre rather than the 4.8 tons per acre amount that Anderson advocated. Additionally, the FSA used what it describes as a statewide payment rate of $74 per ton, rather than the $111 rate that Anderson submitted.[3]

After a series of appeals and remands that are not relevant to this case, Anderson exhausted his administrative remedies with the agency and the National Appeals Division, and filed a petition for review with the district court. The district court denied the petition, finding that the FSA did not act arbitrarily and capriciously or commit an error of law in setting the yield at 3.7 tons per acre and the payment rate at $74 per ton. Anderson v. Farm Serv. Agency, 502 F. Supp. 2d 924, 929-30 (D. Minn. 2007).

## II.    DISCUSSION

We review the agency's factual determinations for substantial evidence in the record, and will reverse if the decision is arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with the law. Farmers Bank v. U.S. Dep't of Agric., 495 F.3d 559, 563 (8th Cir. 2007). As long as the agency provides a rational explanation for its decision, a reviewing court will not disturb it. South Dakota v. Ubbelohde, 330 F.3d 1014, 1031-32 (8th Cir. 2003). If a statute is silent with respect to a specific issue, "there is an express delegation of authority to the agency to elucidate a specific provision of the statute by regulation." Chevron, U.S.A. Inc. v. Natural Res. Def. Council, Inc., 467 U.S. 837, 843-44 (1984). Unless there is a clear

[3]These smaller FSA figures emerge from the United States Department of Agriculture's (USDA) 2002 Minnesota ALL Crop Records Report for Wright County.

expression of congressional intent, regulations are given controlling weight unless arbitrary, capricious, or contrary to the statute.  Hess v. Citibank, (S.D.), N.A., 459 F.3d 837, 842 (8th Cir. 2006).

In the Agricultural Assistance Act of 2003, Congress directed the Secretary of Agriculture to provide funds from the Commodity Credit Corporation "to make emergency financial assistance available to producers on a farm that have incurred qualifying losses for the . . . 2002 crop of an agricultural commodity . . . due to damaging weather or related condition, as determined by the Secretary."  Agricultural Assistance Act of 2003, Title II, Pub. L. No. 108-7, § 202, 117 Stat. 538 (2003).  The statute, relatively brief and general in nature, gives the USDA authority to promulgate regulations to implement the statute.  Chevron, 467 U.S. at 843-44.  The USDA's regulations setting forth the terms and conditions of this program were codified at 7 C.F.R. Part 1480 (2004).[4]  The regulations provided that the 2002 Crop Disaster Program would be carried out in the field by FSA. 7 C.F.R. § 1480.2(a).  The regulations permitted any party dissatisfied with the FSA's decisions to administratively appeal the determination. 7 C.F.R. § 1480.8(e). Additional guidance regarding the 2002 Crop Disaster Program was provided in the FSA Crop Disaster Program "5-DAP Handbook."

---

[4]There is sparse legislative history on the Agricultural Assistance Act of 2003. In the Act, Congress directed the secretary to use the same administrative authority for determining loss thresholds as in the 2000 disaster assistance act.  Pub. L. No. 108-7, § 202(b)(1).  The 2000 act, in turn, refers to the 1999 act.  Agricultural, Rural Development, Food and Drug Administration, and Related Agencies–Appropriations Act, Title VIII, Pub. L. No. 106-387, § 815, 114 Stat. 1549A-55 (2000).  At any rate, the legislative history that we *have* found for the various years' crop disaster programs directs the department to avoid compensating farmers based on artificially inflated price fluctuations, and to reduce the time necessary for processing applications.  E.g., H.R. Rep. No. 106-948, at 148 (2000), as reprinted in 2000 U.S.C.C.A.N. 1451.  It does not delve into the minutiae of whether to use a county, state, or national rate for yield and price figures.  Furthermore, we see nothing in the regulations that is arbitrary, capricious, or contrary to the statute, and afford them deference.

There is no dispute that Anderson is entitled to receive some sort of crop disaster payment for his 2002 alfalfa crop. The 2002 crop disaster regulations provided that producers of an eligible crop were entitled to 2002 crop disaster payments. 7 C.F.R. § 1480.1. And an "eligible crop" was defined as one that was insured by the Federal Crop Insurance Corporation. 7 C.F.R. § 1480.3. Anderson's 2002 alfalfa crop fits within this definition. The only dispute in this case is how much money Anderson is entitled to receive. As earlier noted, the two issues that impact this amount are the yield per acre amount and the payment rate.

The FSA Handbook provides that yield per acre amounts were to be based on whether producers had an "approved" APH yield for the 2002 alfalfa crop. According to the handbook, parties with an approved APH could use that figure as their yield for purposes of crop disaster payments. Parties without an approved APH were required to be paid according to the county average yield. "Approved yield" was defined in the regulations as follows:

> Approved yield means the amount of production per acre, computed in accordance with FCIC's Actual Production History Program (7 CFR part 400, subpart G)[5] . . . . Only the approved yields based on production evidence submitted to FSA prior to the 2003 Act will be used for purposes of the . . . 2002 CDP. *Other yields may be assigned when an eligible approved yield is not available.*

7 C.F.R. § 1480.3 (emphasis added).

Anderson argues that he did have an approved yield because even though his group rate insurance plan did not pay according to individual yield, he actually kept APH yield records as suggested by the group plan disclaimer. The agency, on the

___

[5]These particular regulations, in turn, define "Approved APH yield" as one that is calculated by officials and used to determine the production guarantee that triggers insurance indemnity payments. 7 C.F.R. § 400.52(e).

other hand, argues that because Anderson participated in the group plan, he has no "approved" yield, and must rely on county average, whether or not Anderson gratuitously kept those personal records. The agency points out that Anderson did not have an officially calculated yield for his 2002 alfalfa crop, because this figure was immaterial to his group plan of indemnity insurance, which paid according to county yields.

Although a close question, the agency did not act arbitrarily or capriciously by interpreting its regulations in a manner that precluded Anderson from using his (personally maintained) APH yield, and instead assigning the county yield for the 2002 crop disaster payments. Although one has to carefully connect several dots found respectively in the handbook, C.F.R. part 1480, and C.F.R. part 400 to get to where the agency wants to go, it can be done. As noted, section 1480.3 defined "approved yield" with reference to the insurance programs set forth in part 400. Part 400, in turn, defined approved yield as one that is calculated by county officials for purposes of the insurance payment. 7 C.F.R. § 400.52(e). County officials did not calculate an individual approved yield for Anderson in 2002 because it was not needed for his participation in the group rate plan.

Anderson goes to great pains to convince the court that it should divorce the issue of crop insurance from the crop disaster calculation. But, a view of the 2003 Act, prior statutes, and legislative histories, makes it abundantly clear that Congress intended that there be a link between the two for disaster program purposes. As one example, in the 2003 Act, claimants received higher benefits if they were covered by crop insurance and were precluded from receiving benefits unless they agreed to purchase insurance for the next two crops. Pub. L. No. 108-7, § 202, 117 Stat. 538-39. Anderson purchased crop insurance for the 2002 crop year, of course, and the statute's carrot and stick provisions with regard to crop insurance are not in play here. The point is, it was not arbitrary and capricious for the agency to create a regulatory link between the two when Congress has done so as well. We thus affirm the agency's

decision to use the county rate of 3.7 tons per acre in calculating Anderson's crop disaster payments.

On the other hand, the agency encourages us to separate crop insurance and crop disaster payments with regard to the payment rate. Although not a model of clarity, the FSA handbook basically provides that disaster payment rates should be based on a nationwide rate if there is one, and if not, then a statewide calculation should be used. In this case, FSA determined that there was not a nationwide rate, and calculated Anderson's payments based on a Minnesota statewide rate of $74 per ton. Anderson argues that there was a nationwide rate, and it was $111 per ton. Anderson points to the fact that his *insurance* benefits under the Group Rate Plan were paid based on the $111 rate.

The evidence in the record shows that for insurance purposes $111 per ton was the county payment rate for Wright County, Minnesota. Anderson argues that the same document listing a $111 per ton rate for the county shows that this is necessarily the national rate because the rate was established by the National Agricultural Statistics Service (NASS). But as Anderson recognizes, the same document clearly says that the rate was calculated by dividing the county production estimates by county harvest estimates. This evidences a county, not nationwide rate, despite the fact that a national service calculated the number. There is no evidence in the record suggesting that the $111 rate was used on a nationwide basis.[6] Interestingly, Anderson contends that the agency failed to prove that $74 was the correct rate either, pointing out that the two documents in the record purporting to show that $74 is the statewide rate are lacking in this regard. One of these documents, as earlier noted, is

[6]Nor does the fact that Anderson received this rate for his crop insurance evidence a nationwide, as opposed to a county, rate. As explained earlier, the group plan that Anderson participated in paid according to county yields. More importantly, there is no discernible connection between the insurance actuarial table referenced by Anderson and the disaster payment legislation and regulations.

a printout from a USDA intranet site, entitled "2002 Minnesota ALL Crop Records Report" that simply has a table with numbers plugged into it, and under the price column, the number 74 appears in every box. The other is a table with admittedly more text in it, but the key text–showing the statewide alfalfa rate to be $74–is handwritten, and is the only handwritten note on a page full of otherwise type-written words.

Suffice it to say that the quality and quantity of proof on this issue is deficient, and both sides have failed to enlighten the court. It, however, was Anderson's burden to do so on appeal. Ballanger v. Johanns, 495 F.3d 866, 870 (8th Cir. 2007); 7 C.F.R. § 11.8(e). Anderson certainly carried his burden in establishing a county rate through the NASS figures. But the figures that he produced only reference Wright County and not a national calculation. Although we are not overwhelmed with the agency's "proof," we find that it nonetheless suffices because Anderson has failed to otherwise establish an alternative applicable rate.

## III.   CONCLUSION

We think the FSA's actions in this dispute leave much to be desired. Indeed, the agency treads precipitously close to the arbitrary and capricious line. On the other hand, we detect an element of overreaching on Anderson's part, especially on the price-per-ton dispute. Accordingly, we find that the line was not crossed, and thus affirm.

_____