SCANTEK MEDICAL, INC., Plaintiff,

v.

Angela Chen SABELLA and Accordant Holdings, LLC, Defendants and Third–Party Plaintiffs,

v.

Mintz & Fraade, P.C., Fred Mintz, Alan Fraade, Mintz & Fraade Enterprises, LLC, Zsigmond L. Sagi, and Gibraltar Global Marketing LLC, Third–Party Defendants.

No. 08–CV–453 (CM).

United States District Court, S.D. New York.

Oct. 17, 2008.

Alan Peter Fraade, Mintz & Fraade, P.C., New York, NY, for Plaintiff.

Kenneth Sussmane, McCue, Sussmane & Zapfel, P.C., New York, NY, for Defendant.

DECISION AND ORDER GRANTING IN PART AND DENYING IN PART PLAINTIFF AND THIRD–PARTY DEFENDANTS' MOTION TO DISMISS VARIOUS COUNTERCLAIMS AND COUNTS OF THE THIRD–PARTY COMPLAINT

McMAHON, District Judge.

In this action Scantek Medical, Inc. ("Scantek") sought a declaratory judgment that certain promissory notes and subscription agreements, used as consideration for loans by Angela Chen Sabella ("Sabella") and Accordant Holdings, LLC ("Accordant") to Scantek, are void because they violate New York State's criminal usury statute. Scantek commenced this action in the Supreme Court of the County of New York; defendants removed it to federal court pursuant to 28 U.S.C. § 1332. Sabella and Accordant then moved to dismiss Scantek's amended complaint under Fed.R.Civ.P. 12(b)(6). I granted their motion on September 25, 2008.

Scantek and third-party defendants move this Court to dismiss certain of the counterclaims and some counts in the third-party complaint. For the following reasons, the motion is granted in part and denied in part.

## I. Background

Scantek, a Delaware corporation, filed this action in the Supreme Court of the County of New York on December 21, 2007. Defendants removed the action to this Court on January 17, 2008 under 28 U.S.C. § 1332. On February 26, 2008 Scantek filed a motion to remand, which this Court denied on June 24, 2008.

On February 1, 2008 Scantek filed an amended complaint. Scantek's claims arose out of loans made by Accordant and Sabella (the only member of Accordant) to Scantek. (Amended Compl. ¶¶ 5, 14, 26; Sabella Aff. ¶ 2.) As consideration for these loans, Scantek executed promissory notes in favor of Accordant and Sabella, as well as Subscription Agreements that entitled Accordant and Sabella to shares of Scantek stock. (Amended Compl. ¶¶ 5, 8, 15, 18, 26, 29.) Scantek sought a judgment declaring that the promissory notes and

Subscription Agreements, as well as any shares issued to Accordant and Sabella, were void as criminally usurious under N.Y. Penal Law § 190.40. (*Id.* ¶¶ 24, 35, 43.)

On February 11, 2008, Sabella and Accordant moved to dismiss Scantek's amended complaint under Fed.R.Civ.P. 12(b)(6). I granted the motion on September 25, 2008, because there is no affirmative claim for relief under the criminal usury statute.

On February 26, 2008, Sabella and Accordant filed counterclaims against Scantek for, inter alia, breach of contract relating to their loan transactions with Scantek. On April 17, 2008, they reasserted these counterclaims in their answer to the amended complaint, adding additional factual allegations to their counterclaim for common law fraud.

On February 27, 2008, Sabella and Accordant also filed a third-party complaint, which they amended on April 17, 2008. The amended third-party complaint includes claims against Mintz & Fraade, P.C. (the "Mintz Firm"), Scantek's attorneys, for malpractice and breach of fiduciary duty (Amended Third–Party Compl. ¶ 7), as well as claims against Zsigmond L. Sagi, Scantek's president and largest shareholder, as the result of his personal guarantee on the loan transactions (*id.* ¶ 8).

On May 5, 2008, Scantek and third-party defendants filed the instant motion to dismiss Counterclaims IV through VII and Counts IV through X of the third-party complaint under Fed.R.Civ.P. 12(b) (6), for failure to state a claim upon which relief can be granted. Scantek also moved to dismiss Sabella and Accordant's affirmative defenses to its claims, but that motion is moot because Scantek's claims have been dismissed.

## II. Facts

The following facts from Sabella and Accordant's answer and counterclaims ("AC") against Scantek, and their amended third-party complaint ("ATPC") against the Mintz Firm and two of its members, Alan Fraade and Fred Mintz (collectively the "Mintz Parties"), Mintz & Fraade Enterprises, LLC ("Mintz LLC"), Sagi, and Gibraltar Global Marketing LLC ("Gibraltar"), are presumed to be true for purposes of this motion.

### A. Breach of Contract

In April 2002, Sabella loaned Scantek $100,000 in exchange for a promissory note (the "April 2002 Note") and 400,000 shares of Scantek common stock. (AC ¶ 76; Def. Motion to Dismiss, Ex. A ¶ 8.) In August 2002, pursuant to a Subscription Agreement drafted by the Mintz Firm, Sabella agreed to "invest" an additional $150,000 in Scantek, "evidenced by a 10% promissory note," and to "purchase" shares of Scantek common stock. (AC ¶ 74.)

Sabella tendered the sum of $150,000 to the Mintz Firm and received a promissory note from Scantek, dated August 20, 2002, in the principal amount of $253, 250 (the "August 2002 Note"). (*Id.* ¶¶ 75–76.) The August 2002 Note reflects Sabella's $150,000 August loan, as well as the incorporation and cancellation of the $100,000 April Note and $3,250 of accrued unpaid interest on the April Note. (*Id.* ¶ 76.) The note bears an interest rate of 10% per annum and 24% per annum in the event of default. (*Id.* ¶ 77.)

The August 2002 Note required monthly payments of interest and periodic payments of principal, with the entire unpaid balance of principal and interest due on February 20, 2003. (*Id.* ¶ 78.) Sagi, Scantek's president, personally guaranteed payment and performance of the note.

(*Id.* ¶ 79.) Neither Sagi nor Scantek has made any payments under the note. (*Id.* ¶ 106.)

The August 2002 Subscription Agreement provided that Scantek would "issue to [Sabella] such number of shares of Common Stock ... which will result in the ownership by [Sabella] of six (6) percent of the issued and outstanding Common Stock of the Company." (Def. Motion to Dismiss, Ex. A ¶ 8; AC ¶ 85.) In other words, Sabella would "be issued 2,400,000 shares including the four hundred thousand (400,000) shares of Common Stock of the Company purchased by [Sabella] pursuant to the Subscription Agreement dated April 24, 2002." (Def. Motion to Dismiss, Ex. A ¶ 8). The financial statements that Scantek filed with its Form 10K for the year ending June 30, 2002 report that Sabella purchased 2,000,000 shares of Scantek common stock pursuant to the August 2002 Subscription Agreement. (AC ¶¶ 85–86.) The Subscription Agreement does not provide for the payment of any additional consideration for the shares.

In February 2003, pursuant to a Subscription Agreement drafted by the Mintz Firm, Accordant also agreed to "invest" $50,000 in Scantek, evidenced by a promissory note, and to "purchase" shares of Scantek common stock. (*Id.* ¶ 90.) In exchange for this $50,000 loan, which was tendered to the Mintz Firm, Scantek issued Accordant a promissory note on February 10, 2003, reflecting a principal amount of $50,000 and an interest rate of 12% per annum (the "February 2003 Note"). (*Id.* ¶¶ 91, 93.) Interest and principal were due in full on June 6, 2003. (*Id.* ¶ 93.) Sagi personally guaranteed payment and performance of the February 2003 Note. (*Id.* ¶ 94.) Neither Sagi nor Scantek has paid any principal or interest on the note. (*Id.* ¶ 106.)

The February 2003 Subscription Agreement provided that Scantek would issue Accordant six shares "[f]or every $1 loaned to the Company" (i.e. 300,000 shares for the $50,000 loan), and additional shares if Scantek defaulted on the loan. (Def. Motion to Dismiss, Ex. B ¶ 8; AC ¶¶ 98–99.) Scantek never issued any shares to Accordant. (AC ¶¶ 98–99.)

From November 2003 through May 2004, Accordant loaned Scantek an additional $425,000. (*Id.* ¶ 100.) On February 17, 2004, Sabella also loaned Scantek an additional $100,000. (*Id.* ¶ 103.) The sums loaned from Sabella and Accordant were wire transferred to the Mintz Firm's attorney escrow account. (*Id.* ¶¶ 100, 103.) These loans allegedly bear an interest rate of 10% per annum, and in the event of default, the lesser of 18% per annum or the highest rate permitted under New York law (*id.* ¶¶ 101, 104), although they are not alleged to be evidenced by any promissory notes. However, Scantek admits (in its brief) that the November 13, 2003 loan by Accordant was evidenced by a promissory note and personally guaranteed by Sagi. (Pl. & Third–Party Def. Reply Mem. at 5; *see* AC ¶ 102.) All of the additional loans have matured, but Scantek has not made any payments towards them. (AC ¶¶ 105–06.)

Sabella and Accordant have counterclaimed against Scantek, and filed a third-party complaint against Sagi, for breach of contract for failure to repay these loans and interest thereon. They seek repayment of the loans, plus interest and reasonable costs of collection. Accordant has not alleged a claim against Scantek for breach of contract for failure to issue the 300,000 shares of Scantek common stock under the February 2003 Subscription Agreement, or for any additional shares allegedly due because of Scantek's default on the loan.

### B. Fraud and Negligent Misrepresentation

#### 1. *The Allegedly Usurious Nature of the Loans*

Sabella and Accordant allege that Scantek engaged in a scheme to defraud them by structuring private placements in order to fund its capital needs. (*Id.* ¶¶ 137–38.) The scheme was that investors would make loans in exchange for promissory notes and restricted stock (collectively "the Securities"). (*Id.*) Scantek's Forms 10K from 1999 to 2003 reflect eighteen private placements of common stock, including the August 20, 2002 shares issued to Sabella. (*Id.* ¶ 70.) Private placements entered into after August 20, 2002 were not reported, because Scantek ceased making filings with the SEC. (*Id.* ¶ 71.)

Sabella and Accordant allege that Scantek, Sagi, and the Mintz Firm structured these transactions in order to argue that the loans violate New York's criminal usury statute, and so do not have to be repaid by Scantek. (*Id.* ¶¶ 138–39.) According to Sabella and Accordant, Scantek, Sagi and the Mintz Firm selected New York law as the governing law for the Securities (as opposed to Delaware or New Jersey law), "even though New York had no connection to the transactions, because New York law allows a corporation to interpose the defense of criminal usury." (*Id.* ¶ 142.) New York's criminal usury statute prohibits a person from knowingly charging interest on a loan at a rate exceeding 25% per annum. N.Y. Penal Law § 190.40. As noted above, in exchange for their August 2002 and February 2003 loans to Scantek, Sabella and Accordant received promissory notes bearing interest rates of 10% and 12% per annum, respectively—well within

the legal rate. (*See* AC ¶¶ 77, 93.) However, Scantek claims that the stock Sabella and Accordant received (or should have received) pursuant to the Subscription Agreements constituted additional interest on their loans, since it was (or was to be) issued without any other consideration. (Amended Compl. ¶¶ 22, 33.) Valuing the stock using its closing market price on the dates of the August 2002 and February 2003 Notes, Scantek calculates that the stock results in additional interest of approximately 79% and 113% per annum, respectively. (*Id.* ¶¶ 19–20, 22, 30–31, 33.) Therefore, according to Scantek, the August 2002 and February 2003 loans were usurious because the total interest rates amounted to 89% and 125% per annum, respectively. (*Id.* ¶¶ 22, 33.)

Sabella and Accordant, on the other hand, value the stock using its par value of $0.001. (*See* AC ¶ 85–89.) Using the par value to calculate the value of the stock yields a total interest rate of under 25% on both the August 2002 and February 2003 loans. Thus, according to Sabella and Accordant's valuation method, their loans to Scantek were not usurious.[1] However, Sabella and Accordant allege that, if their loans to Scantek are in fact usurious, Scantek, Sagi, and the Mintz Firm failed to disclose that the that the loans violated New York's criminal usury statute. (*Id.* ¶ 140, 143–44; ATPC Count V.)

#### 2. *Allegedly False Statements Regarding Sales in Brazil*

Sabella and Accordant also allege that Scantek induced them to enter into the loan transactions by falsely stating that Scantek was going to sell medical devices in Brazil. (AC ¶ 148.) Sabella alleges that pursuant to its scheme to deceive her

---

1. It does not seem that Sabella and Accordant are disputing the proposition that the stock constituted additional interest on the loans.

about the status of the sales, Scantek included a provision in the August 2002 Note "providing for payment to Sabella of $0.475 for each medical device sold in Brazil until principal and interest were paid in full." (*Id.*)

Allegedly false statements about the sales appear in three of Scantek's SEC filings. Scantek's 2001 Form 10K stated that Scantek "expects to ship the Breast-Care(TM)/BreastAlert(TM) device from the United Stated during the fourth quarter of calendar 2001 to Brazil." (*Id.* ¶ 149.) Scantek's 2002 Form 10K stated that Scantek "expects to ship the Breast-Care(TM)/BreastAlert(TM) device from the United States during the fourth quarter of calendar 2002 to Brazil" and "expects cash flow from sales commencing in the fourth quarter of calendar 2002." (*Id.* ¶ 150.) Scantek's Form 10Q, filed with the SEC on May 20, 2003, stated that Scantek "anticipates sale of its entire inventory in calendar year 2003" and "expects cash flow from sales commencing in 2003 to cover operations of the Company through December 2003." (*Id.* ¶ 151.) According to Sabella and Accordant, these statements were false because Scantek did not expect such shipments or sales to commence; Scantek made these false representations to induce investors to purchase securities. (*Id.* ¶¶ 149–50.)

Scantek and Sagi also made allegedly false oral and written representations from April 2002 through May 20, 2004 pertaining to sales in Brazil. (*Id.* ¶ 152; ATPC ¶ 116.) On April 24, 2002, Scantek and Sagi allegedly represented to Sabella in writing that the proceeds of Sabella's April 2002 loan "will be used exclusively would be used solely [sic] for our Brazilian activities." (AC ¶ 153.) And on January 14, 2003, Scantek allegedly represented that an order for 100,000 medical devices was confirmed and "would be emitted [sic] with

a letter of credit inside 30 days." (*Id.* ¶ 154.) In May 2003, Scantek also allegedly represented to Sabella in writing that a test by the Brazilian National Institute of Cancer would commence on May 15, 2003. (*Id.* ¶ 155.)

Sabella and Accordant allege that, in May 2003, Scantek's private placement memorandum (1) falsely represented that Scantek had largely executed its strategy of establishing a regional manufacturing facility in South America; (2) failed to disclose that sales to Brazil had not commenced, and that orders from Brazil had not been shipped by Scantek; (3) falsely represented that Scantek received required approvals for sale of its devices in Brazil when it had not; and (4) failed to disclose that Scantek had not received an import license to ship products to Brazil. (*Id.* ¶ 156.)

Sabella and Accordant allege that they would not have invested in Scantek but for these misrepresentations. (*Id.* ¶ 160.) Sabella and Accordant bring claims against Scantek, Sagi, and the Mintz Firm for common law fraud, common law negligent misrepresentation, and violation of Section 10(b) of the Securities Exchange Act of 1934 (the "Exchange Act"). (*Id.* Countercl. V–VII; ATPC Counts V, VI, VIII.) Sabella and Accordant also claim that Sagi, the Mintz Parties, and Mintz LLC violated Section 20(a) of the Exchange Act as control persons. (ATPC Count VII.) They seek damages of at least $828,500, plus interest and punitive damages.

## C. Malpractice and Breach of Fiduciary Duty

Sabella alleges that the Mintz Parties committed malpractice. (*Id.* Count IX.) Although it appears that the Mintz Parties were Scantek's lawyers, Sabella contends that the Mintz Firm represented her in connection with certain investments she

made "on or about the time of her investments in Scantek." (*Id.* ¶ 20.) Sabella also alleges that the Mintz Firm continues to act on her behalf as escrow agent for 3,000,000 Scantek shares, which were put in escrow by Sagi pursuant to a March 5, 2003 Escrow Agreement as security for his personal guarantee of the February 2003 Note. (*Id.* ¶¶ 57, 155.)

Sabella alleges that she did not retain separate counsel in connection with the loans to Scantek or waive any conflict of interest, and that she relied on the Mintz Parties to draft valid, binding, and enforceable agreements. (*Id.* ¶¶ 156–58.) Sabella alleges that the Mintz Parties committed malpractice by failing to advise her that the agreements they drafted violate New York's usury statute and that Scantek intended to claim that the Securities were voidable. (*Id.* ¶¶ 159–62.)

Sabella also claims that the (1) Mintz Parties (as counsel to her), (2) Sagi (as the President and a controlling shareholder of Scantek), and (3) Mintz LLC (as a controlling shareholder of Scantek) owed her a fiduciary duty. (*Id.* ¶¶ 166–68.) According to Sabella, these third-party defendants breached that fiduciary duty by failing to disclose any risk that the loans violate New York's usury statute and by engaging in a scheme to issue voidable Securities. (*Id.* ¶¶ 169–71.)

Sabella seeks damages of at least $828,500 on these claims, plus interest and punitive damages. (*Id.* ¶¶ 164, 172.)

### D. Fraudulent Conveyance

In January 2007, Scantek and Mintz LLC formed Gibraltar, a limited liability company. (AC ¶ 63.) Around March 15, 2007, Scantek announced that it entered into a distribution agreement with Gibraltar, granting Gibraltar distribution rights to a Scantek medical device in over 150 countries worldwide. (*Id.* ¶ 130.) Sabella and Accordant allege that the granting of such rights constituted a conveyance, made without fair consideration to Scantek at a time it was insolvent, and that the conveyance left Scantek unreasonably undercapitalized. (*Id.* ¶¶ 130–33.) Sabella and Accordant also allege that the conveyance was made with actual intent to hinder, delay, or defraud them and therefore they are entitled to have the Gibraltar Distribution Agreement annulled. (*Id.* ¶¶ 134–35.) Sabella and Accordant bring claims against Scantek and Gibraltar for fraudulent conveyance under N.Y. Debt. & Cred. Law §§ 274 and 276. (*Id.* ¶¶ 133–34; ATPC Count IV.)

### III. Discussion

Rule 12(b) (6) of the Federal Rules of Civil Procedure provides for dismissal of a complaint that fails to state a claim upon which relief can be granted. The standard of review on a motion to dismiss is heavily weighted in favor of the pleader. In ruling on a motion to dismiss for failure to state a claim, the court is required to accept all material facts alleged in the complaint as true and draw all reasonable inferences from those allegations in the pleader's favor. *Roth v. Jennings,* 489 F.3d 499, 500 (2d Cir.2007) (citations omitted).

"While a complaint attacked by a Rule 12(b)(6) motion to dismiss does not need detailed factual allegations, a [pleader's] obligation to provide the grounds of his entitlement to relief requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Bell Atl. Corp. v. Twombly,* 550 U.S. 544, 127 S.Ct. 1955, 1959, 167 L.Ed.2d 929 (2007). A pleader must assert "enough facts to state a claim to relief that is plausible on its face." *Id.* at 1974. This "plausibility standard" is a flexible one, and requires "a pleader to amplify a claim with some factual allegations in

those contexts where such amplification is needed to render the claim *plausible.*" *Iqbal v. Hasty,* 490 F.3d 143, 157–58 (2d Cir.2007).

■ In deciding a motion to dismiss, this Court may consider the full text of documents that are quoted in the complaint, documents that the pleader either possessed or knew about and relied upon in bringing the suit, and public disclosure documents filed with the SEC. *Rothman v. Gregor,* 220 F.3d 81, 88–89 (2d Cir.2000) (citations omitted).

## A. Statute of Limitations Motions

■ Scantek and third-party defendants seek dismissal of various claims in the amended answer and counterclaims and the amended third-party complaint as barred by the applicable statutes of limitation. In a diversity case, state law governs the limitations period for state law claims, and federal statutes of limitation govern the federal law claims. *Cantor Fitzgerald v. Lutnick,* 313 F.3d 704, 709 (2d Cir.2002) (*citing Ragan v. Merchs. Transfer & Warehouse Co.,* 337 U.S. 530, 533, 69 S.Ct. 1233, 93 L.Ed. 1520 (1949)); *Meridien Int'l Bank v. Liberia,* 23 F.Supp.2d 439, 446 (S.D.N.Y.1998). Under the "relation back" doctrine found in both New York and federal law, the claims in the amended counterclaims and third-party complaint are deemed to have been asserted on the date of the original counterclaims and third-party complaint, because the claims arise out of the same conduct and transactions that were set out in these original pleadings. N.Y. C.P.L.R. § 203(f); Fed.R.Civ.P. 15(c) (1)(B). Therefore, the relevant dates for determining whether Sabella and Accordant's claims are time-barred are February 26, 2008 for counterclaims and February 27, 2008 for counts of the third-party complaint.

### 1. The Malpractice Claim Against the Mintz Parties (ATPC Count IX) Is Time–Barred

■ The statute of limitations for a legal malpractice claim is three years, "regardless of whether the underlying theory is based in contract or tort." N.Y. C.P.L.R. § 214(6); *Zorn v. Gilbert,* 8 N.Y.3d 933, 933, 834 N.Y.S.2d 702, 866 N.E.2d 1030 (2008). An action for legal malpractice accrues when the malpractice is committed, not when the client discovers it. *Shumsky v. Eisenstein,* 96 N.Y.2d 164, 166, 726 N.Y.S.2d 365, 750 N.E.2d 67 (2001).

Sabella's claim for legal malpractice arises out of the Mintz Parties' role in drafting the August 2002 and February 2003 loan transaction agreements. Sabella claims that the Mintz Parties represented her "in connection with certain investments" she made "on or about the time of her investments in Scantek." (ATPC ¶ 20.) Even if this means that the Mintz Parties represented Sabella in all of her investment transactions with Scantek, her cause of action accrued at the time those transactions took place. Therefore, at the latest, Sabella's malpractice cause of action accrued in May 2004, when she last invested in Scantek, and expired three years later, in May 2007. Sabella's third-party complaint was not filed until February 2008. If Sabella had any claim against the Mintz Parties (which is doubtful), it expired nine months before it was filed.

Sabella argues that her cause of action actually accrued in December 2007, when this lawsuit commenced. She alleges that the Mintz Parties committed malpractice by "advising one client [Scantek] ... to sue another client [Sabella] to void promissory notes that they drafted in transactions in which they represented all parties." (Def. Opp. Mem. at 8.) However,

the Mintz Parties were clearly not representing Sabella when they filed this lawsuit on behalf of Scantek. Sabella does not actually allege any facts tending to show that the Mintz Parties represented her at any time; however, to the extent she does, the "representation" occurred many years prior to 2007, when this lawsuit was filed.

■ Sabella also attempts to invoke the continuous representation doctrine. The continuous representation doctrine tolls the statute of limitations in a legal malpractice action only where the continuing representation "pertains specifically to the matter in which the attorney committed the alleged malpractice." *Offshore Express, Inc. v. Milbank, Tweed, Hadley & McCloy, LLP,* No. 07–1974–, cv, 2008 U.S.App. LEXIS 17950, at \*2, 2008 WL 3992323 (2d Cir. Aug. 20, 2008) (*quoting Shumsky,* 96 N.Y.2d at 168, 726 N.Y.S.2d 365, 750 N.E.2d 67). Thus, to invoke the continuous representation doctrine, Sabella must establish: "(1) ongoing representation connected to the specific matter at issue in the malpractice action, and (2) clear indicia of an ongoing, continuous, developing and dependent relationship between the client and the attorney." *De Carlo v. Ratner,* 204 F.Supp.2d 630, 636 (S.D.N.Y.2002) (quotations omitted).

■ Sabella did not plead any facts showing that the Mintz Parties continued to represent her in connection with the specific matter at issue in her malpractice claim—the loan transactions. Although the Mintz Firm allegedly acts as Sabella's escrow agent by holding shares given by Sagi as security on the February 2003 Note, "Service as an escrow agent does not provide a basis for invocation of the continuous representation doctrine." *Lazzaro v. Kelly,* 57 N.Y.2d 630, 632, 454 N.Y.S.2d 59, 439 N.E.2d 868 (1982). Nor can Sabella invoke the continuous representation doc-

trine through Mark Stepniewski, who was Sabella's investment consultant (Fraade Aff. ¶ 5), and who allegedly had an attorney-client relationship with the Mintz Parties (Stepniewski Aff. ¶ 2). Sabella argues that the Mintz Parties represented Stepniewski when he acted as her agent in negotiating the loan transactions with Scantek, and that the Mintz Parties continued to represent Stepniewski until December 2007. However, Sabella pleads no facts tending to show that the continued representation of Stepniewski was at all connected with the previously consummated loan transactions that are the subject of this lawsuit. Therefore, the continuous representation is inapplicable to Sabella.

Because Sabella's malpractice claim against the Mintz Parties is time-barred, the motion to dismiss Count IX of the third-party complaint is granted.

2. *The Breach of Fiduciary Duty Claim Against All Third–Party Defendants (ATPC Count X) Is Timely*

■ The statute of limitations for a claim of breach of fiduciary duty is a function of the type of relief sought: if monetary relief is sought, the claim is viewed as alleging "injury to property" and the three-year statute of limitations of N.Y. C.P.L.R. § 214(4) applies; if equitable relief is sought, the six-year statute of limitations of N.Y. C.P.L.R. § 213(1) applies. *See Cooper v. Parsky,* 140 F.3d 433, 440–41 (2d Cir.1998); *Klein v. Gutman,* 12 A.D.3d 417, 784 N.Y.S.2d 581, 584 (2d Dep't 2004). However, "[where], as here, the breach of fiduciary duty involves allegations of actual fraud, the statute of limitations is six years regardless of the remedy sought." *Pro Bono Invs., Inc. v. Gerry,* No. 03 Civ. 4347(JGK), 2005 WL 2429787, at \*14 (S.D.N.Y. Sept. 30, 2005) (citing *Kaufman v. Cohen,* 307 A.D.2d 113, 760 N.Y.S.2d 157, 164 (1st Dep't 2003)). Sa-

bella and Accordant's claim for breach of fiduciary duty is based on actual fraud because they allege that the third-party defendants engaged in a scheme to issue them voidable securities. Therefore, the six-year statute of limitations of N.Y. C.P.L.R. § 213(8) applies. *See Bastys v. Rothschild,* No. 97 Civ. 5154(CM)(GAY), 2000 WL 1810107, at *34 (S.D.N.Y. Nov. 21, 2000).

■ N.Y. C.P.L.R. § 213(8) provides that for "an action based upon fraud; the time within which the action must be commenced shall be the *greater* of six years from the date the cause of action accrued or two years from the time the [pleader] ... discovered the fraud, or could with reasonable diligence have discovered it." *Id.* (emphasis added). Using the six-year limitations period, Sabella and Accordant's cause of action accrued at the time of the last loan transaction in May 2004. Sabella and Accordant filed their third-party complaint in February 2008, less than four years later and well within the limitations period. Therefore, the motion to dismiss Count X of the third-party complaint as time-barred is denied.

3. *The Violation of Exchange Act § 10(b) Claims Against Scantek, Sagi, the Mintz Parties and Mintz LLC (AC Countercl. VI; ATPC Count VI) Are Time–Barred*

■ Under the Sarbanes–Oxley Act of 2002, the statute of limitations for claims arising under Section 10(b) of the Exchange Act is the earlier of (1) two years after the discovery of the facts constituting the violation or (2) five years after the violation. 28 U.S.C. § 1658(b).

Sabella and Accordant's Section 10(b) claims arise out of allegedly false statements made in Scantek's SEC filings, and various oral and written statements regarding the sale of medical devices in Bra-

zil. These claims fall into two categories: (1) alleged § 10(b) violations that took place more than five years before Sabella and Accordant's claims were filed; and (2) alleged § 10(b) violations that occurred between two and five years before the claims were filed.

(1) Alleged Violations More Than Five Years Old

The alleged violations that fall into category (1) are the statements in Scantek's Forms 10K for the years ending June 30, 2001 and 2002 (filed with the SEC on October 15, 2001 and October 17, 2001, respectively, *see* www.secinfo.com) and the written representations from April 24, 2002 and January 14, 2003 (AC ¶¶ 153–54), The counterclaims and third-party complaint were filed in February 2008, more than five years after these alleged violations occurred. Therefore, under 28 U.S.C. § 1658(b)(2), these alleged violations are time-barred.

(2) Alleged Violations Between Two and Five Years Old

■ The alleged violations that fall into category (2) are the statements in Scantek's Form 10Q that was filed on May 20, 2003 (AC ¶ 151), the written representation to Sabella in May 2003, and any other oral or written statements from February 2003 through May 20, 2004. Scantek argues that the two-year statute of limitations of 28 U.S.C. § 1658(b)(1) applies to these alleged violations.

■ The two-year limitations period of the Sarbanes–Oxley Act begins to run after an investor "obtains actual knowledge of the facts giving rise to the action or notice of the facts, which in the exercise of reasonable diligence, would have led to actual knowledge." *Lentell v. Merrill Lynch & Co.,* 396 F.3d 161, 167 (2d

Cir.2005) (quotation omitted). An investor is placed on "inquiry notice," and a duty of inquiry arises, "when the circumstances would suggest to an investor of ordinary intelligence the probability that she has been defrauded." *Id.* at 168 (quotation and citations omitted). If a duty of inquiry arises and an investor makes no inquiry, "knowledge will be imputed as of the date the duty arose." *LC Capital Partners, LP v. Frontier Ins. Group, Inc.,* 318 F.3d 148, 154 (2d Cir.2003).

▇▇▇▇ The circumstances giving rise to a duty of inquiry are often called "storm warnings." *Id.* For inquiry notice to be triggered, the storm warnings must "relate[ ] *directly* to the misrepresentations and omissions" the investor alleges to be fraudulent. *Lentell,* 396 F.3d at 169 (quotation omitted). Whether an investor had sufficient storm warnings to place her on inquiry notice is appropriate for resolution on a motion to dismiss if the storm warnings "can be gleaned from the complaint and papers ... integral to the complaint." *LC Capital Partners,* 318 F.3d at 156 (*quoting Dodds v. Cigna Sec., Inc.,* 12 F.3d 346, 352 n. 3 (2d Cir.1993)).

▇▇▇▇ Scantek argues that Sabella and Accordant were on inquiry notice as early as February 20, 2003, when Scantek defaulted on the August 2002 Note. The default was allegedly a storm warning because the note provided that Sabella would receive proceeds from the sale of medical devices in Brazil until the note was paid in full, and Sabella never received such proceeds. I agree. Scantek was required to repay its loan with proceeds from its Brazil sales. The fact that Scantek defaulted on this obligation would suggest to an ordinary investor that statements Scantek made about upcoming sales in Brazil were probably false. Sabella and Accordant received yet another storm warning on June 6, 2003, when Scantek defaulted on the

February 2003 Note, even though Scantek stated in its May 20, 2003 Form 10Q that it anticipated "sale of its entire inventory in calendar year 2003." (AC ¶ 151.)

▇▇▇▇ Scantek's failure to file quarterly and annual reports with the SEC after filing its last Form 10K in September 2003 was also a storm warning. The fact that that Scantek remained a public company after 2003, yet failed to make its required SEC filings, beginning with the Form 10Q that was due to be filed in November 2003, would suggest to a reasonable investor that the company was in financial trouble and that any statements to the contrary were probably false.

▇▇▇▇ Through May 2004, Sabella and Accordant allegedly continued to receive written and oral representations from Scantek about its Brazilian sales. Even if these statements were regarded as "reassurances," they did not prevent Sabella and Accordant from being on inquiry notice, because "an investor of ordinary intelligence" would not have reasonably relied on these statements to allay concerns that should have arisen as a result of earlier defaults. *LC Capital Partners,* 318 F.3d at 155. No reasonable investor would rely on statements that sales were ongoing when that investor had the right to receive, but was not receiving, proceeds from those sales as repayment for hundreds of thousands of dollars Scantek had borrowed.

Despite numerous "storm warnings," Sabella and Accordant failed to make any inquiry into whether they were defrauded. They are, therefore, imputed with knowledge of the fraud as of the date their duty of inquiry arose, which was, at the latest, November 2003 (and probably earlier). Thus, the two-year limitations period expired at the latest in November 2005. Because Sabella and Accordant did not file

their counterclaims and third-party complaint until February 2008, their allegations of securities fraud that fall into category (2) are time-barred.

4. *The Violation of Exchange Act § 20(a) Claims Against the Mintz Parties, Mintz LLC and Sagi (ATPC Count VII) Are Dismissed for Failure to State a Violation of Exchange Act § 10(b)*

Sabella and Accordant allege that the Mintz Parties, Mintz LLC, and Sagi are "controlling persons of Scantek" who are liable under Exchange Act § 20(a). (ATPC ¶ 140.) However, a claim under § 20(a) "is necessarily predicated on a primary violation of securities law." *Rombach v. Chang*, 355 F.3d 164, 177–78 (2d Cir.2004). Sabella and Accordant's § 20(a) claims are predicated on violations of § 10(b). Since their § 10(b) claims have been dismissed as time-barred, their § 20(a) claims must also be dismissed. *See id.* at 178.

**B. General Pleading Motions**

1. *The Common Law Fraud and Negligent Misrepresentation Claims Against Scantek, Sagi, the Mintz Parties and Mintz LLC (AC Countercl. V, VII; ATPC Count V, VIII) Are Pled with Particularity and Sufficiency*

▮▮▮ To state a claim of common law fraud and common law negligent misrepresentation under New York law, Sabella and Accordant must plead the statements or misstatements constituting the fraud with particularity, and must also plead that they reasonably relied on the alleged misrepresentations. Fed.R.Civ.P. 9(b); *Harsco Corp. v. Segui*, 91 F.3d 337, 342 (2d Cir.1996) (*citing Channel Master Corp. v. Aluminium Ltd. Sales, Inc.*, 4 N.Y.2d 403, 407, 176 N.Y.S.2d 259, 151

N.E.2d 833 (1958) (fraud); *Heard v. City of New York*, 82 N.Y.2d 66, 75–76, 603 N.Y.S.2d 414, 623 N.E.2d 541 (1983) (negligent misrepresentation)). Scantek argues that Sabella and Accordant failed to plead fraud and misrepresentation with the requisite particularity and that they cannot plead reasonable reliance as a matter of law.

a. Rule 9(b)

▮▮▮ Scantek argues that Sabella and Accordant failed to plead fraud with particularity as required by Fed.R.Civ.P. 9(b). In order to comply with Rule 9(b), "the complaint must: (1) specify the statements [or omissions] that the plaintiff contends were fraudulent, (2) identify the speaker, (3) state where and when the statements [or omissions] were made, and (4) explain why the statements [or omissions] were fraudulent." *Lerner v. Fleet Bank, N.A.*, 459 F.3d 273, 291 (2d Cir. 2006) (quotation omitted). The complaint must also "allege facts that give rise to a strong inference of fraudulent intent," which may be established "(a) by alleging facts to show that defendants had both motive and opportunity to commit fraud, or (b) by alleging facts that constitute strong circumstantial evidence of conscious misbehavior or recklessness." *Id.* (quotations omitted).

▮▮▮ The counterclaims and third-party complaint (1) identify allegedly fraudulent statements pertaining to sales of medical devices in Brazil (2) made by Scantek (3) from 2001 to 2004 in three SEC filings and various oral and written communications (AC ¶¶ 149–56), (4) that were fraudulent because Scantek did not expect such shipments to commence (*id.* ¶¶ 149–50). Sabella and Accordant also allege facts showing that Scantek had both a motive an opportunity to commit fraud, which give rise to a strong inference of fraudulent

intent. Scantek had a motive to deceive Sabella and Accordant into purchasing the Securities because of its negligible sales and need for funds. (*Id.* ¶ 68.) Scantek's inclusion of a provision in the August 2002 Note providing for payments for each sale in Brazil evidences Scantek's opportunity and intent to defraud Sabella. (*Id.* ¶ 148.) Thus, it is clear that Sabella and Accordant pled fraud in connection with the sale of medical devices in Brazil with particularity.

■ Sabella and Accordant's fraud claims also allege that Scantek engaged in a scheme to defraud investors, by structuring private placements with the intent of claiming that the issued Securities violate New York's usury statute and are voidable. (*Id.* ¶ 138). Sabella and Accordant allege the following fraudulent omissions in connection with this scheme: (1) Scantek's SEC filings, which evidence these private placements, and Scantek's audited financial statements failed to disclose any violation of usury laws by investors who purchased the Securities (*id.* ¶¶ 70, 73, 145–47); and (2) Scantek failed to disclose the opinion of its counsel that the Securities issued to Sabella and Accordant were usurious (*id.* ¶ 144), Sabella and Accordant allege facts giving rise to a strong inference of Scantek's fraudulent intent by alleging that Scantek had a motive to structure illegal private placements "in order to fund its capital needs." (*Id.* ¶ 137.) They also allege that Scantek and third-party defendants had an opportunity to defraud them because "Scantek, Sagi, and the Mintz Parties had the authority and, in fact, ability to control the contents of the disclosures made in connection with the offering of the Securities to Accordant and Sabella." (*Id.* ¶ 139.) In addition, Sabella and Accordant allege Scantek's fraudulent intent by claiming that "Scantek selected New York law as the governing law for the

Securities even though New York had no connection to the transactions because New York law allows a corporation to interpose the defense of criminal usury." (*Id.* ¶ 142.)

■ Scantek argues that the claim that it engaged in a scheme to defraud is inadequately pled because Sabella and Accordant's allegations are based "upon information and belief." However, all that Sabella and Accordant allege "upon information and belief" is that Scantek, Sagi, and the Mintz Parties engaged in a scheme to issue Securities they did not intend to honor (*id.* ¶¶ 138–41), a matter "peculiarly within the opposing party's knowledge." *Luce v. Edelstein,* 802 F.2d 49, 54 n. 1 (2d Cir.1986) (quotation omitted). Sabella and Accordant support this claim with the factual allegations discussed above, which state with particularity the basis upon which their belief is founded. *See id.* Sabella and Accordant's allegations meet the Rule 9(b) standard because they specify the time, place, speaker, and content of the alleged fraudulent omissions, unlike *Luce,* on which Scantek relies, in which all of those required allegations were based "upon information and belief." *Id.* at 54.

Sabella and Accordant's fraud claims meet the pleading requirements of Rule 9(b) and sufficiently plead the element of reliance. Therefore, the motion to dismiss Counterclaims V and VII and Counts V and VIII of the third-party complaint for failure to plead fraud with particularity is denied.

### b. Waiver of Reliance

■■ When a contracting party disclaims "the existence of or reliance on specified representations," that party "will not be allowed to claim it entered the contract in reliance thereon." *Aetna Cas. & Sur. Co. v. Aniero Concrete Co.,* 404

F.3d 566, 576 (2d Cir.2005) (quotation omitted). When, on the other hand, "a contract contains an 'omnibus statement' disclaiming that any representations outside the contract were made, it will not preclude a claim for fraud." *Id.* at 575–76 (*quoting Mfrs. Hanover Trust Co. v. Yanakas,* 7 F.3d 310, 315 (2d Cir.1993)).

 The requirement that the disclaimer be specific is "relaxed when the contracting parties are 'sophisticated business people,' and the disclaimer clause is the result of negotiations between them." *Id.* at 576 (*quoting Citibank, N.A. v. Plapinger,* 66 N.Y.2d 90, 95, 495 N.Y.S.2d 309, 485 N.E.2d 974 (1985)). However, "even an explicit waiver will not be given effect 'when the facts are peculiarly within the knowledge of the party invoking the disclaimer.'" *Id.* (*quoting Banque Arabe Et Internationale v. Md. Nat. Bank,* 57 F.3d 146, 155 (2d Cir.1995)).

 Scantek argues that the following disclaimer in the August 2002 and February 2003 Subscription Agreements precludes Sabella and Accordant's reliance on statements in its SEC filings:

> I ... acknowledge that no statements, representations or warranties, have been made or furnished to me, or to my advisors, by the Company [Scantek], or by any person acting on behalf of the Company, with respect to the sale of the Securities, and/or the economic, tax, or any other aspects or consequences of this investment, and that I have not relied upon any information with respect to the offering, written or oral, other than the information contained in this Subscription Agreement. I further understand that any documents other than this Subscription Agreement, regardless of whether distributed prior to, simultaneously with, or subsequent to, the date of this Subscription Agreement should not be relied upon in determining whether to make an investment in the Securities and I expressly acknowledge, agree and affirm that I have not relied upon any such literature in making my determination to make an investment in the Securities.

(Def. Motion to Dismiss, Ex. A ¶ 4; *see also id.,* Ex B ¶ 5.)

Sabella and Accordant first argue that this disclaimer is immaterial because the Subscription Agreements are not binding. They note that the August 2002 Agreement was only executed by Sabella and the February 2003 Agreement was only executed by Scantek. However, the conduct of Sabella and Accordant in making the loans—i.e., in performing their obligations—appears to negate any argument that could be made under the statute of frauds.

But even if the agreements are binding (which I will assume for purposes of this motion), I cannot conclude, on a motion to dismiss, that the disclaimer clause contained in the Subscription Agreements precludes Sabella and Accordant's fraud claims. The disclaimer clause is an "omnibus statement," as opposed to a specific disclaimer. Sabella and Accordant contend that the agreements were drafted solely by the Mintz Firm on behalf of both parties and that they were not the product of negotiations. And they allege that the Mintz Parties and Scantek concealed information from them in order to induce them to sign the agreements. Finally, the information that Sabella and Accordant relied on in the SEC statements—the expected sales in Brazil—was information solely within the knowledge of Scantek, the party now seeking to invoke the disclaimer. Therefore, at this stage I cannot dismiss the claims for fraud and misrepresentation as barred by waiver.

### c. The "Bespeaks Caution" Doctrine

█ The "bespeaks caution" doctrine allows a court to conclude that forward-looking statements in a company's SEC filings are not fraudulent as a matter of law if they are accompanied by sufficient cautionary language. *See Halperin v. eBanker USA.com, Inc.*, 295 F.3d 352, 357 (2d Cir.2002); *Ackerman v. Price Waterhouse*, 252 A.D.2d 179, 683 N.Y.S.2d 179, 194 (1st Dep't 1998) (citation omitted). Under federal securities law, forward-looking statements are statements of projections, plans, or future economic performance. 15 U.S.C. § 78u–5(i)(1).

█ Since "[c]autionary language in securities offerings is just about universal," the court must determine whether the cautionary language expressly warns of or directly relates to the risk that brought about the investor's loss. *Halperin*, 295 F.3d at 359. "Vague disclosures of general risks will not protect defendants from liability." *Miller v. Lazard Ltd.*, 473 F.Supp.2d 571, 579 (S.D.N.Y.2007). And even if the warning is specific, the bespeaks caution doctrine does not protect "a defendant from liability if a statement was knowingly false when made." *In re Alliance Pharm. Corp. Sec. Litig.*, 279 F.Supp.2d 171, 192 (S.D.N.Y.2003); *Ackerman*, 683 N.Y.S.2d at 194 (citation omitted).

Obviously, the "bespeaks caution" doctrine assumes less importance in this case because the securities fraud claims have been dismissed. However, New York courts have applied a variant of the doctrine to state law claims. In *Ackerman*, plaintiffs, who invested in tax shelter limited partnerships, sued their accountants for negligence and malpractice in preparing their Schedules K–1 ("U.S. Partnership Returns of Income"). *Id.* at 183–84, 683 N.Y.S.2d 179. According to plaintiffs, defendants gave them allegedly negligent tax advice regarding the continued use of an accounting practice that was repudiated by the IRS. *Id.* at 184, 683 N.Y.S.2d 179. The Appellate Division affirmed the Supreme Court's denial of class certification in the case, but rejected defendants' argument that individual issues of reliance would predominate because of the "bespeaks caution" doctrine. *Id.* at 194, 683 N.Y.S.2d 179. The court found that, while warnings in defendants' initial offering materials would negate misrepresentation claims regarding the initial use of the accounting practice, the warnings did not negate subsequent misrepresentations regarding defendants continued use of the practice after it had been repudiated. *Id.*

Similarly, in *Faulkner v. Beer*, No. 603597/05, 2007 N.Y. Misc. LEXIS 8829, 2007 WL 4639458 (Sup.Ct. N.Y. County Dec. 21, 2007), the Supreme Court denied defendants' motion to dismiss common law fraud and negligent representation claims relating to plaintiff's purchase of securities, on the ground that defendants were shielded from liability under the "bespeaks caution" doctrine. *Id.*, at *12–13.

Scantek argues that the forward-looking statements that Sabella and Accordant rely on, pertaining to expected sales in Brazil, are protected by bespeaks caution doctrine because the SEC Forms 10K contained the following cautionary language:

> All statements contained herein that are not historical facts, including, but not limited to, statements regarding anticipated growth in revenue, gross margins and earnings, statements regarding the Company's current business strategy, the Company's projected sources and uses of cash, and the Company's expectations, are forward-looking statements in nature and involve a number of risks and uncertainties. *Actual results may differ materially....* The Company wishes to caution readers not to place

undue reliance on any such forward-looking statements. These statements are made pursuant to the Private Litigation Reform Act of 1995 and, as such, speak only as of the date made.

(Def. Motion to Dismiss, Exs. C at 1, D at 1 (emphasis added).) Despite this cautionary language, Scantek cannot invoke the protection of the bespeaks caution doctrine, because Sabella and Accordant plead that the misstatements they relied upon were knowingly false when made. They allege that "Scantek did not expect such shipments to commence" and only included the statements to "induce investors to purchase Securities." (AC ¶¶ 149–50.)

■ Even if Sabella and Accordant did not plead that the statements were knowingly false when made, the cautionary language in Scantek's SEC filings does not protect Scantek from liability because it does not warn of the specific risk that caused Sabella and Accordant's loss—the risk that shipments to Brazil would not commence. Cautionary language that is "generic" and warns that actual results may be "materially different" than projections, like the language used in Scantek's SEC filings, "'does not come close to the cautionary language needed to render reliance on the misrepresentation unreasonable.'" *In re NTL, Inc. Sec. Litig.*, 347 F.Supp.2d 15, 35 n. 119 (S.D.N.Y.2004) (*quoting In re Vivendi Universal, S.A. Sec. Litig.*, 381 F.Supp.2d 158, 183 (S.D.N.Y.2000)).

### 2. The Fraudulent Conveyance Claims Against Scantek and Gibraltar (AC Countercl. IV; ATPC Count IV) Are Pled with Particularity

■ Sabella and Accordant claim that Scantek's conveyance of distribution rights to Gibraltar was a fraudulent conveyance under New York Debtor and Creditor Law §§ 274 and 276. In order to state a claim under § 274, Sabella and Accordant must allege that the conveyance was made without fair consideration and that as a result of the conveyance, Scantek was left with unreasonably small capital to conduct its business. N.Y. Debt. & Cred. Law § 274. Since a § 274 claim involves a constructively fraudulent conveyance, intent to defraud is not an element, *see Sharp Int'l Corp. v. State St. Bank & Trust Co. (In re Sharp Int'l Corp.)*, 403 F.3d 43, 53 (2d Cir.2005), and such a claim is not subject to the heightened pleading requirement of Fed.R.Civ.P. 9(b). *Drenis v. Haligiannis*, 452 F.Supp.2d 418, 428 (S.D.N.Y.2006) (citations omitted). Rather, a claim under § 274 requires only "a short and plain statement of the claim showing that the pleader is entitled to relief." *Id. (quoting* Fed.R.Civ.P. 8(a)(2)).

■ Section 276 provides, "Every conveyance made ... with actual intent, as distinguished from intent presumed in law, to hinder, delay, or defraud either present or future creditors, is fraudulent as to both present and future creditors." N.Y. Debt. & Cred. Law § 276. Since a claim under § 276 requires proof of actual intent to defraud, it must be pled with specificity as required by Rule 9(b). *In re Sharp*, 403 F.3d at 56. However, because of the difficulty of proving actual intent, such intent may be inferred from circumstantial evidence, known as "badges of fraud." *Id.* (citations omitted); *Drenis*, 452 F.Supp.2d at 429. These "badges of fraud" include: (1) a close relationship between the parties to the conveyance; (2) inadequacy of consideration received; (3) retention of control of the property by the transferor; (4) suspicious timing of the conveyance after the debt was incurred; (5) the use of fictitious parties; and (6) information that the transferor was insolvent as a result of the conveyance. *See In re Sharp*, 403 F.3d at 56; *Drenis*, 452 F.Supp.2d at 429.

Scantek and Gibraltar do not argue that Sabella and Accordant fail to meet the

Rule 8(a)(2) pleading requirements for their § 274 claim; they only argue that the pleading requirements of Rule 9(b) are not met. Sabella and Accordant's § 274 claim easily meets Rule 8(a)(2)'s pleading requirements; they pled that the conveyance by Scantek to Gibraltar of the distribution rights to Scantek's medical device was made without fair consideration and left Scantek with unreasonably small capital. (ATPC ¶¶ 94, 96.) Furthermore, Scantek's SEC filings show that Scantek sold a 48% interest in Gibraltar to a company named Life Medical Technologies, Inc. ("Life Medical") for $5,000,000, but only received $250,000 upon the signing of the agreement, while the remaining $4,250,000 payment was subject to various contingencies. (Sussmane Aff., Ex. C.) Therefore, Sabella and Accordant's factual allegations as to the adequacy of consideration are at least enough to raise her right to relief above the speculative level, and are more appropriately dealt with on a motion for summary judgment or at trial.

 Sabella and Accordant also adequately pled their claim for fraudulent conveyance under § 276. They pleaded several badges of fraud inferring that Scantek had an actual intent to defraud them, including the close relationship between Scantek and Gibraltar (a limited liability company that Scantek itself formed) and the inadequacy of the consideration received.

Since Sabella and Accordant adequately pled their fraudulent conveyance claims under N.Y. Debt. & Cred. Law §§ 274 and 276, the motion to dismiss Counterclaim IV and Count IV of the third-party complaint is denied.

### C. Sabella and Accordant's Request for Punitive Damages

Sabella and Accordant seek punitive damages for their common law fraud, com-mon law negligent misrepresentation, and breach of fiduciary duty claims. Scantek and third-party defendants ask that this request be denied now. I will decide whether to charge the jury on punitive damages after all of the evidence has been presented.

## IV. Conclusion

For the foregoing reasons, plaintiff and third-party defendants' motion to dismiss Counterclaim VI and Counts VI, VII, and IX of the third-party complaint is granted. The motion to dismiss Counterclaims IV, V, and VII and Counts IV, V, VIII, and X of the third-party complaint is denied.

The parties should appear for a conference on November 7, 2008 at 10:15 AM.